No. 22-1573

IN THE UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

CLARY HOOD, INC.,

*Petitioner-Appellant*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

ON APPEAL FROM THE DECISION OF

THE UNITED STATES TAX COURT

OPENING BRIEF FOR THE APPELLANT

William Curtis Elliott, Jr.
Stanton Paul Geller
Culp Elliott & Carpenter, P.L.L.C.
6801 Carnegie Boulevard, Suite 400
Charlotte, NC 28211
(704) 372-6322
wce@ceclaw.com; spg@ceclaw.com

Raboteau Terrell Wilder, Jr.
Wilder Pantazis Law Group
3501 Monroe Road
Charlotte, NC 28205
(704) 342-2243
rob@wilderlawgroup.com

*Counsel for Petitioner-Appellant*

September 27, 2022

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 22-1573        Caption: Clary Hood, Inc. v. Commissioner of Internal Revenue

Pursuant to FRAP 26.1 and Local Rule 26.1,

Clary Hood, Inc.
(name of party/amicus)

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                   ☐ YES ☑ NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Raboteau T. Wilder, Jr          Date:  September 24, 2022

Counsel for: Clary Hood, Inc.

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT...………………………………………i

TABLE OF AUTHORITIES ...............................................................................v

STATEMENT OF JURISDICTION ..................................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .......................... 2

STATEMENT OF THE CASE ............................................................................. 4

SUMMARY OF THE ARGUMENT .................................................................... 8

ARGUMENT........................................................................................................ 8

   I.     Standard of Review ................................................................................. 9

   II.    Many Tax Court and appellate court decisions hold that robust returns to shareholders resulting from outstanding performance by an executive justify extraordinary compensation to that executive. Because of CHI's CEO's efforts, CHI's retained earnings increased almost 600% over six years, and, in the relevant tax years, CHI's shareholders garnered returns on equity of 22% and 36% for 2015 and 2016, respectively. Did the trial judge commit legal error in ignoring those benefits to shareholders as a valid reasonable compensation factor, or a "lens" factor, in his analysis of the reasonableness of the CEO's compensation for 2015 and 2016? ......................................................................................................10

   III.   Did the trial court commit clear error in concluding that the rationale for the bonuses in question was to pay disguised dividends?........................................27

   IV.   The trial judge found that for 2015, CHI had good cause and reasonable reliance in its tax advisors as a penalty defense under Internal Revenue Code Sections 6662 and 6664. The record contains undisputed testimony that the same level and type of tax advice was communicated by CHI's advisors for its 2016 year and tax return. Was the failure of the trial judge to find the reliance defense to Code Section 6662 for 2016 clearly erroneous? ................................................32

V.     The U.S. Tax Court regards as irrelevant the location of circuit courts of appeals decisions as case law authority in assessing the tax penalty defense of "substantial authority." It also uses a nationwide approach of considering shareholder returns as a "lens" through which the other factors of reasonable compensation are viewed and analyzed.  Did the trial judge commit legal error in refusing to find that "substantial authority" existed as another defense to penalties against CHI under Code Section 6662? ............................................................33

VI.    The Court should consider adoption of the Seventh Circuit's presumptive standard for investor returns under Menard to deter reasonable compensation litigation under similar circumstances. ...............................................................34

CONCLUSION ................................................................................................37
REQUEST FOR ORAL ARGUMENT ..............................................................37
CERTIFICATE OF COMPLIANCE .................................................................39
CERTIFICATE OF SERVICE ..........................................................................40

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                         <u>PAGES</u>

<u>Anderson v. Bessemer City</u>. 470 U.S. 564 (1985) -------------------------------- 27, 31

<u>Choate Construction Co. v. C.I.R.</u>, T.C. Memo 1997-495 (1997)--------------- 25, 34

<u>Comm'r of Internal Revenue v. Duberstein</u>, 363 U.S. 278 (1959) -------------------- 9

<u>Dexsil Corp. v. C.I.R.</u>, 247 F.3d 96 (2nd Cir. 1998)------------------------------ 23, 34

<u>Est. of Wallace v. Commissioner</u>, 965 F.2d 1038 (11th Cir. 1992) ------------------- 9

<u>Exacto Spring Corp. v. Commissioner</u>, 196 F.3d 833 (7th Cir. 1992) ---------- 26, 34

<u>Faulconer v. C.I.R.</u>, 748 F.2d 890 (4th Cir. 1984) ------------------------------------ 9

<u>Fifth Ave. Coach Lines, Inc. v. Commissioner</u>, 31 T.C. 1080 (1959) --------------- 12

<u>H.W. Johnson, Inc. v. Commissioner</u>, T.C. Memo 2016-95 (2016)---------25, 26, 34

<u>Haffner's Serv. Stations, Inc. v. Commissioner</u>, T.C. Memo 2002-38 (2002)  22, 34

<u>Herold Mktg. Assoc., Inc. v. C.I.R.</u>, T.C. Memo 1999-26 (1999)- 13, 15, 16, 23, 34

<u>Home Interiors & Gift, Inc. et al., C.I.R.</u>, 73 T.C. 1142 (1980) 8, 11, 12, 13, 17, 18, 23, 34, 36

<u>Kennedy v. Commissioner</u>, 671 F.2d 167 (6th Cir. 1982) --------------- 20, 21, 23, 34

<u>Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo 1995-153</u> --- 13, 21, 22, 35

<u>Menard, Inc., v. Commissioner</u>, 560 F.3d 620 (7th Cir. 2009) ----------- 4, 34, 35, 36

<u>Neonatology Assocs. P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000)--------------- 32

<u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d 1315 (5th Cir. 1987)--- 9, 18, 19, 21, 34

<u>Pulsar Components Intern., Inc. v. C.I.R.</u>, T.C. Memo 1996-129 (1996) - 13, 14, 15, 23, 34

<u>Rapco, Inc. v. Commissioner</u>, 85 F.3d 950 (2d Cir. 1996) ----------------------------- 9

<u>Richland Med. Assn. v. C.I.R.</u>, 953 F.2d 639 (4th Cir. 1992)------------------------- 19

# TABLE OF AUTHORITIES—Continued

<div align="right">**Pages**</div>

Sunbelt Clothing Company, Inc. v. Commissioner, T.C. Memo 1997-338 (1997)

-------------------------------------------------------------------------- 12, 13, 17, 18, 34

United States v. Antone, 742 F.3d 151 (4th Cir. 2014) -------------------------------28

United States v. Boyle, 469 U.S. 241 (1985) -------------------------------------32

United States v. Hall, 664 F.3d 456 (4th Cir. 2012) ------------------------------ 27, 28

Webster Tool & Die, Inc. v. C.I.R., T.C. Memo 1985-604 (1985)------------------25

## STATUTES

Internal Revenue Code 26 USC Section 162----------------------------------- 4, 12, 13

Internal Revenue Code 26 USC Section 6212 ------------------------------------- 2

Internal Revenue Code 26 USC Section 6214 ------------------------------------- 2

Internal Revenue Code 26 USC Section 6662 ------------------------------- 3, 4, 32, 33

Internal Revenue Code 26 USC Section 6664 --------------------------------------3, 32

Internal Revenue Code 26 USC Section 7442 ------------------------------------- 2

Internal Revenue Code 26 USC Section 7482 ------------------------------------- 2

## OTHER AUTHORITIES

General Accounting Office, "*Tax Administration: Recurring Issues in Tax Disputes Over Business Expense Deductions*" (September 1995) -----------------35

Rev. Proc. 92-23, 1992-1 C.B.737, sec/4(b)(4)-----------------------------------36

## REGULATIONS

Treas. Reg. § 1.6662-4(d)(2) ------------------------------------------------33

Treas. Reg. § 1.6662-4(d)(3) ------------------------------------------------33

Treas. Reg. § 1.6662-4(d)(3)(i)----------------------------------------------33

Treas. Reg. § 1.6662-4(d)(3)(iii)--------------------------------------------34

Treas. Reg. § 1.6662-4(d)(3)(iv)(B) -----------------------------------------34

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

CLARY HOOD, INC.,

*Petitioner-Appellant*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

## ON APPEAL FROM THE DECISION OF
## THE UNITED STATES TAX COURT

## OPENING BRIEF FOR THE APPELLANT

## STATEMENT OF JURISDICTION

This case involves the deductibility of officer compensation paid by Appellant Clary Hood, Inc. ("CHI") to its Chief Executive Officer, Clary Hood, for the tax years ending May 31, 2015 ("2015") and May 31, 2016 ("2016"). After conducting an audit, the Commissioner of Internal Revenue mailed notices of deficiency under

Section 6212 of the Internal Revenue Code on December 3, 2018, followed by a revised notice of deficiency on February 1, 2019.

CHI timely filed its Petition with the Tax Court on February 12, 2019. Respondent timely filed its Answer on April 17, 2019, and CHI filed its Reply to Respondent's Answer on May 23, 2019. The Tax Court had jurisdiction under 26 USC Section 7442 and 26 USC Section 6214.

On March 2, 2022, Judge Greaves issued his Opinion, and on May 12, 2022, he entered the final Decision, or Judgment. Those final decisions disposed of all the claims of the parties. On May 18, 2022, within 90 days after entry of the Decision, CHI filed timely notice of appeal with the Tax Court. This Court has jurisdiction under 26 USC Section 7482.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Many Tax Court and appellate court decisions hold that robust returns to shareholders resulting from outstanding performance by an executive justify extraordinary compensation to that executive. Because of CHI's CEO's efforts, CHI's retained earnings increased almost 600% over six years, and, in the relevant tax years, CHI's shareholders garnered returns on equity of 22% and 36% for 2015 and 2016, respectively. Did the trial judge commit legal error in ignoring those benefits to shareholders as a

valid reasonable compensation factor, or a "lens" factor, in his analysis of the reasonableness of the CEO's compensation for 2015 and 2016?

2. Did the trial court commit clear error in concluding that the rationale for the bonuses in question was to pay disguised dividends?

3. The trial judge found that for 2015, CHI had good cause and reasonable reliance in its tax advisors as a penalty defense under Internal Revenue Code Sections 6662 and 6664. The record contains undisputed testimony that the same level and type of tax advice was communicated by CHI's advisors for its 2016 year and tax return. Was the failure of the trial judge to find the reliance defense to Code Section 6662 for 2016 clearly erroneous?

4. The U.S. Tax Court regards as irrelevant the location of circuit courts of appeals decisions as case law authority in assessing the defense of "substantial authority." It also uses a nationwide approach of considering shareholder returns as a "lens" through which the other factors of reasonable compensation are viewed and analyzed. Did the trial judge commit legal error in refusing to find that "substantial authority" existed as another defense to penalties against CHI under Code Section 6662?

5. The Court should consider adoption of the seventh circuit's presumptive standard for investor returns under <u>Menard</u> to deter reasonable compensation litigation under similar circumstances.

## STATEMENT OF THE CASE

CHI is a land grading and excavation contractor located in Spartanburg, South Carolina. It files a C corporation federal income tax return. During tax year 2015, it paid its Chief Executive Officer, Clary Hood, compensation of $5,168,559, and for 2016, it paid him $5,196,500. For both years, Mr. Hood was awarded a year-end bonus of $5,000,000.

In 2017 and 2018, the Commissioner audited CHI's tax returns for the tax years 2015 and 2016. The Commissioner then issued a statutory notice of deficiency originally dated December 3, 2018, followed by a revised notice of deficiency on February 1, 2019. The Commissioner asserted that the disallowed amounts of CEO compensation could not be deducted under Code Section 162, because these amounts were unreasonably excessive in amount and not for services rendered. The deficiency notice also asserted understatement penalties against CHI under Internal Revenue Code Section 6662.

The case was tried before Honorable Travis A. Greaves, remotely on the Tax Court's Zoom platform, on March 1, 2, 3, 5, 8, and 9, 2021. The parties filed 196

stipulations of fact. Twelve witnesses testified. The parties filed post-trial briefs as directed by the court.

On March 2, 2022, Judge Greaves issued his opinion in which he disallowed deductions on CHI's tax returns in the amounts of $1,620,194 for 2015, and $3,965,927 for 2016. He further found that no penalty should be assessed against CHI for 2015, but that a penalty of $282,398 should be assessed for 2016. CHI timely filed its appeal to this Court.

For several decades, CHI made most of its money doing grading and excavation for new Walmart stores. It was good work, but Walmart gradually reduced the profit margins it would pay CHI. By 2010, most of the Walmart work CHI completed resulted in a very small profit or broke even. In 2011, CHI's CEO, Mr. Clary Hood, unilaterally reinvented CHI's business model by dropping Walmart projects in favor of more lucrative commercial work. Over the six-year period from 2010 to 2016, this pivotal decision spawned CHI's extraordinary growth in its retained earnings, benefiting its shareholders, by skyrocketing *six-fold* from $5,550,877 to $31,262,166 in 2016. CHI's dramatic success was found to result not from prevailing economic conditions, but from Mr. Hood's highly effective efforts to grow the company, with his unique construction industry acumen as the driving force of that extraordinary success. In the 2015 tax year, CHI allocated $4,323,362 of current net after-tax earnings to its shareholders as additional retained earnings.

This figure represented a 45.55% share of its current year's after-tax profits (increase in the year's retained earnings divided by the denominator sum of: (i) the year's increase in retained earnings plus (ii) Mr. Hood's compensation), a 58% share of its pre-tax net income, and a retained earnings increase of 24.8% over its prior year retained earnings. Its shareholders' return on equity for 2015 was 22%, as the parties stipulated.

In 2016, CHI allocated $9,516,744 of current net after-tax earnings to its shareholders, for a year-end retained earnings balance of $31,262,166, which was a 43.8% increase over the prior year's retained earnings (and most likely an increase in the fair market value of its shareholders' stock). This resulted in the allocation of the bulk, or "lions' share", of CHI's 2016 profits being 65% of its after-tax profits and 74% of its pre-tax profits. CHI generated a 36% return on equity investment for its shareholders in 2016, which was an increase of 63% from the prior year's 22% return on equity. (JA193-194). In 2015, according to Respondent's expert, Mr. Fuller, CHI's pre-tax profit margin based on revenues was 16.1% compared to an industry average of 6.1%, placing CHI in the 90th percentile ranking of industry profitability. In 2016, Mr. Fuller found CHI's pre-tax profit margin based on revenues was 21.1% compared to an industry average of 5.8%, placing it again in the 90th percentile of industry profitability. The pre-tax profit margin includes all compensation paid, including Mr. Hood's. Based on its industry standing for return

on equity, Mr. Fuller placed CHI at a median industry ranking in 2015, and at an upper quartile ranking for 2016. CHI presented undisputed testimony from its outside CPA, Jeff Greenway, a construction industry partner of Elliott Davis Decosimo. Greenway said that CHI's gross profit margins were consistently and substantially higher than the hundreds of other construction companies he had worked with in his thirty-five years of construction company accounting and advisory work in the local Greenville-Spartanburg geographic market area.

In planning for the end of tax-year 2015, CHI's CFO, Chris Phillips, conferred with the outside CPAs employed by the Elliott Davis Decosimo accounting firm. Both Phillips and the outside CPAs believed that Hood had been grossly underpaid over the course of his career, and especially when considering the company's economic success (which stemmed from Mr. Hood's reinvention of CHI in 2011). They suggested a year-end bonus of $5,000,000. Mr. Hood was resistant because he preferred to keep cash in the business so the company could expand its fleet of heavy equipment, among other business reasons. The financial team prevailed upon him to accept the bonus. The same bonus advice and protocols were used in 2016.

The IRS concluded that the bonus was unreasonable and assessed a deficiency. CHI petitioned the Tax Court for a redetermination of the deficiencies. After full discovery, the trial was held, and the trial court largely ruled against CHI, resulting in this appeal.

## SUMMARY OF THE ARGUMENT

CHI believes that the court below erred by failing to follow the teaching of the <u>Home Interiors & Gift, Inc. et al., C.I.R.</u>, 73 T.C. 1142 (1980) line of cases described below. Those cases require consideration of pay in excess of the norm for extraordinary executive performance. The court also erred in rejecting returns to shareholders as a valid factor to consider in the Fourth Circuit and did not discuss or consider the undisputed and stipulated evidence of return on equity and retained earnings build up to the benefit of CHI's shareholders. The court below moreover erred in failing to properly balance the factors relating to reasonableness of compensation by putting all the decisional weight on compensation of similarly situated executives in the industry based on broad statistics. The court below further erred in failing to recognize that the same analysis of year-end bonus compensation, and the communication and recommendation protocols by CHI's CPAs that were approved for 2015, were also in place in 2016, based on the uncontroverted and harmonious testimony of all the witnesses involved in that process who testified 100% consistently at trial.

**ARGUMENT**

## I.     Standard of Review

Although the issue of reasonable compensation is a question of fact, <u>Owensby &</u>

<u>Kritikos, Inc. v. Commissioner</u>, 819 F.2d 1315 (5th Cir. 1987), the definition of the

appropriate factors to consider and their application and delineation in the analysis

of those factors is reviewable by the Fourth Circuit *de novo* as a question of law. <u>Est.</u>

<u>of Wallace v. Commissioner</u>, 965 F.2d 1038 (11th Cir. 1992); <u>Rapco, Inc. v.</u>

<u>Commissioner</u>, 85 F.3d 950, 954 (2d Cir. 1996); <u>Elliott's Inc. v. Commissioner</u>, 716

F.2d 1241, 1245 (9th Cir. 1983). After a *de novo* review, the Tax Court's

determination will be reversed only if it is clearly erroneous. See <u>Owensby</u> at 1323.

A finding is clearly erroneous when, although there is evidence to support it, a

review of the entire record leaves the reviewing court with the definite and firm

conviction that a mistake has been made. <u>Comm'r of Internal Revenue v.</u>

<u>Duberstein</u>, <u>363 U.S. 278</u>, 291 (1959). See <u>Faulconer v. C.I.R.</u>, 748 F.2d 890, 895

(4th Cir. 1984).

II.     **Many Tax Court and appellate court decisions hold that robust
         returns to shareholders resulting from outstanding performance by
         an executive justify extraordinary compensation to that executive.
         Because of CHI's CEO's efforts, CHI's retained earnings increased
         almost 600% over six years, and, in the relevant tax years, CHI's
         shareholders garnered returns on equity of 22% and 36% for 2015
         and 2016, respectively. Did the trial judge commit legal error in
         ignoring those benefits to shareholders as a valid reasonable
         compensation factor, or a "lens" factor, in his analysis of the
         reasonableness of the CEO's compensation for 2015 and 2016?**

This case is about reasonable compensation for extraordinary executives
performing beyond industry norms by a company experiencing phenomenal
economic success. The case law is discussed below. It is important at the outset to
say what this case is <u>not</u> about. It is not about a circumstance where a company
stripped all its profits to pay a disguised dividend to a valued employee/shareholder,
or where the bulk of the profits were paid as compensation to an executive. To the
contrary, the bulk of CHI's profits, after paying a hefty tax bill, were set aside for
the shareholders as retained earnings, including 65% of the after-tax profits in tax
year 2016, counting Mr. Hood's compensation as a part of those profits.

Many cases about reasonable compensation deal with an executive who is
irreplaceable and whose extraordinary efforts have triggered or led to unprecedented
economic success for their company. Most of the cases describe the executive as a
"workaholic" whose dedication to the company's success eclipses any other interest
in life. The cases, some of which are set forth here, allow for very high pay to such

executives when certain parameters are met. As stipulated by the parties and found by the court below, Mr. Hood is this kind of executive, and, as CHI argued below, he deserves "home run pay for home run performance" (JA227).

Perhaps the seminal case setting forth the notion that high pay beyond the supposed industry norm for exceptional executives is reasonable is <u>Home Interiors & Gift, Inc. et al., C.I.R.</u>, 73 T.C. 1142 (1980). Here, the Tax Court found that the two executives whose compensation was in question were "principally responsible" for and "invaluable" in the success of the company. The IRS presented expert testimony that "like executive" compensation for other industry executives similarly situated in peer companies was substantially less than that given the relevant executives at Home Interiors. The court found that the expert testimony was credible and economically valid. Still, the court found that the expert testimony was irrelevant, carried no weight as a factor, and was inapplicable when the executives' efforts resulted in extraordinary results for the taxpayer. The court also considered that other employees were also given large bonuses. Many of CHI's line employees were given bonuses that increased 400% from the time that Mr. Hood permanently changed the direction of the company (JA339-343). Further, in 2017, executives of CHI were awarded extraordinary bonuses of $2,000,000 to President Andy Painter, $2,000,000 to Executive Vice-President Justin Pearson, and $2,000,000 to Controller Tammy McCraw (JA389-390). The Court below did not consider the

undisputed testimony about those bonuses in its reasoning. The Home Interiors court also balanced these factors out with the factor of whether the corporate taxpayer provided a fair share of company profits as a return to its shareholders.

On correctly balancing the analysis of reasonable compensation factors, Home Interiors looked to Fifth Ave. Coach Lines, Inc. v. Commissioner, 31 T.C. 1080 (1959), aff'd. and rev'd on other issues, 281 F.2d 556 (2d Cir. 1960), and held that "Section 162 of the Code was not designed to regulate businesses by denying them a deduction for compensation in excess of the norm." (See also Sunbelt Clothing Company, Inc. v. Commissioner, T.C. Memo 1997-338 (1997) (same holding, "in cases where other factors call for higher compensation").

Home Interiors teaches that in cases involving large amounts of executive compensation, there are countervailing factors that render the supposed industry norm for like executives of increasingly low weight, to the point of being irrelevant. The more a talented CEO's performance is extraordinary, the more that performance drives the corporate taxpayer's extraordinary financial success, the more that lieutenant executives and rank and file employees are fairly compensated, and the more the corporation's shareholders are allocated a fair share of corporate profits, the less relevant the industry norm for compensation becomes. When the counterbalancing factors support the executive, the relevance, or weight of industry norms vanishes. This is because broad industry statistics in the face of sound, basic

financial achievements by the taxpayer become unhelpful or irrelevant. Section 162(a)(1) was not designed to regulate businesses by denying them a deduction for the payment of compensation in exceeding the norm, particularly when these countervailing factors predominate in favor of the taxpayer, as in this case. CHI submits that Section 162 was not designed to supplant a taxpayer's reliable and basic financial and economic evidence with statistically crafted "industry norms" in circumstances presented here.

The rationale of Home Interiors helps CHI's case, and the facts are similar to this one. So the next inquiry might be whether the case is an outlier and an anomaly. The answer is that it is not. Three cases that exemplify this reasoning are Pulsar Components Intern., Inc. v. C.I.R., T.C. Memo 1996-129 (1996), Sunbelt Clothing Co., Inc. v. C.I.R., T.C. Memo 1997-338 (1997), and Herold Mktg. Assoc., Inc. v. C.I.R., T.C. Memo 1999-26 (1999). In Pulsar, the Tax Court acknowledged there is a natural tension between the desire for skilled executives to be paid the true value of their contribution versus the tax law demand that compensation be reasonable. It noted that ". . . the term 'reasonable' must reflect the intrinsic value of employees in the broadest and most comprehensive sense." Pulsar, p. 8. (citing Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo 1995-153)

The Pulsar court described 14 factors that might be used in determining the reasonableness of compensation. The Court below appeared not to review Mr.

Hood's compensation using a multi-factor test but focused almost solely upon Mr. Hood's compensation relative to that of other industry executives who Respondent's expert believed were similar to Mr. Hood. <u>Pulsar</u> highlighted the importance of the executive's qualifications and found those in question were highly qualified. Mr. Hood is similarly highly qualified, as stipulated by the parties and as found by the court below. <u>Pulsar</u> emphasized the value of a unique trading system developed by Pulsar's executives. Mr. Hood had the unique vision to transform the type of work done by CHI, and to essentially re-invent and transform the company permanently into the future. Its trajectory of success was found by the court below to be his achievement alone, and not because of general economic conditions. Yet it did not move the needle on the consideration of the reasonableness of his compensation.

The <u>Pulsar</u> court found that a hypothetical independent investor would have found an increase in its retained earnings of $952,582 during three- years to have been a worthy performance. <u>Pulsar</u>, p. 10. From the time that Mr. Hood changed CHI's direction in 2011 by dropping Walmart-related projects through 2016 (i.e., six years), CHI's shareholders' equity mushroomed from $5,478,422 to $31,262,166. This was a specific finding of fact by the trial judge in his opinion (Opinion ft. 17, JA1484)) but was a factor not addressed or analyzed as a return to shareholder factor in his analysis. That is an increase of almost 600% in shareholders' equity and represents an equity growth rate of about 33%. The <u>Pulsar</u>

court also found it significant that the taxpayer reported taxable income of $995,460 during the subject year, the point being that the compensation didn't strip the taxpayer of cash. CHI reported taxable income of $4,929,399 for 2015 and $11,831,302 for 2016. This shows that CHI did not take all its assets and transfer them to Mr. Hood. Instead, it paid a healthy tax bill <u>and</u> boosted the shareholders' equity.

Other factors in CHI's favor considered by <u>Pulsar</u> were Mr. Hood's low compensation in prior years, the increase in CHI's financial condition during the relevant time, and that Mr. Hood guaranteed CHI's debt, none of which appeared to be considered to any significant degree by the court below.

Similarly, in <u>Herold Marketing</u>, the corporate taxpayer's CEO was a workaholic with strong vision and industry insight, who reinvented the company's business model and strategy and was the primary reason for the company's extraordinary levels of success. Mr. Hood powered CHI and re-invented the business model of CHI with resounding financial results due to him and not prevailing economic conditions. The taxpayer in <u>Herold Marketing</u>, like CHI, paid no dividends. Correctly noting that the increases in the taxpayer's retained earnings most likely increased the value of its stock, the Tax Court found that $450,000 in retained earnings growth over an 8-year period would have been acceptable growth to a hypothetical investor because of its 15%-19% shareholder returns on

equity. CHI's retained earnings grew six-fold from 2010 to 2016, which the trial judge acknowledged as a growth of shareholder equity value from $5,550,877 to $31,262,166, was a more than fair share return to its investors. (JA594) That is particularly true when viewed together with the taxpayer's shareholders in 2016 receiving the "bulk" or 65% of its after-tax profits, 74% of pre-tax profits and a return on equity that year of 36% (as the parties stipulated – Stip. Par. 170, JA193-194).

Because of those factors, the court in Herold Marketing declined to give any weight to the IRS's expert report on like compensation industry norms comparisons. The court held that the report did not show statistical reliability or that the statistical group considered showed similar financial traits to the CHI's situation. The court concluded that the large amounts of compensation paid to Mr. Herold were reasonable.

But here (and putting Mr. Fuller's statistical integrity aside because of a lack of information about the local marketplace of competitors and statistical sampling shortcomings) Mr. Fuller's testimony helps CHI. He found that compared to RMA industry peers, CHI's profit margins in 2015 were in the 90th percentile, and based on return on equity, CHI's 22% in 2015 (Stip, Par. 170, JA192) was at least as good as industry median and in the upper quartile in 2016 at 36% (Stip. Par. 170, JA192). The Herold Court also found there was no evidence as a factor unfavorable

to the taxpayer that it compensated other employees differently just because of that CEO's status as a shareholder. The undisputed evidence here is that CHI compensated other employees fairly if not generously, providing year-end bonuses to rank and file employees from 2012 to 2016 that doubled almost every year and providing extraordinarily large, multi-million-dollar bonuses to lieutenant executives in 2017. (JA389-390).

Home Interiors rejected and declined to give any weight to the IRS expert's testimony on industry norms and like executive compensation where the other high-performance factors attributable to the CEO predominate. Here, it was stipulated by the parties, and the court below commented at length upon, that Mr. Hood was both a dedicated leader of vision and that his efforts led to the financial boom to CHI. Still, the court below failed to analyze the factors by balancing them out, but erroneously put all (100%) of the weight on Mr. Fuller's industry "like executive report", while giving lip service to the other undisputed factors for consideration before him.

Sunbelt followed the rationale of Home Interiors. Rejecting the IRS's expert report concluding that the executives only could be paid the industry executive averages, the court held that ". . . section 162 is not 'designed to regulate businesses by denying a deduction for the payment of compensation in excess of the norm' in cases where other factors call for higher compensation." Sunbelt, p. 11, quoting

<u>Home Interiors</u>. The Court also looked with favor on the practice of looking at whether a hypothetical investor would receive a fair return on its investment after payment of that compensation. <u>Sunbelt</u>, p. 11, quoting <u>Owensby & Kritikos v. C.I.R.</u>, 819 F.2d 1315 (5th Cir. 1987) at 1326-1327. The IRS argued that the compensation was merely a disguised dividend. Yet the court found that the compensation of those executives was bargained for at arms' length. Much like this case, one executive had his CPA consult management about the payment for his principal. Here, two sets of CPA's and the CFO of CHI both discussed and determined appropriate compensation for Mr. Hood and suggested the specific compensation at issue.

Ultimately, the <u>Sunbelt</u> Court declined to "second guess" the taxpayer's board of directors and concluded that the compensation paid was reasonable given the performance of the executives and the value to the taxpayer as shared with its shareholders. CHI chose to strategically retain its earnings to aggressively build its equipment fleet to top of the line status. (JA159, JA24-252, JA549-552). It also retained earnings to build a strong balance sheet, to enhance bonding capacity, and to win more jobs because of its financial stature. (JA347-349). The retained earnings increased equity value for its shareholders. (JA349). The court below acknowledged that leaving the money in the company was a good investment. (JA594).

Despite the solid case law of his own Tax Court described above, the court below enunciated what it thought the law on just compensation is in the Fourth Circuit. It appears to CHI that the last time this Court dealt with reasonable compensation was <u>Richland Med. Assn. v. C.I.R.</u>, 953 F.2d 639 (4th Cir. 1992) While Richland was a <u>per curiam</u> decision decided in 1992, this Court cited with approval the standards in <u>Owensby & Kritikos, Inc. v. C.I.R.</u>, 819 F.2d 1315, 1323 (5th Cir. 1987). ) ("The so-called independent investor test is simply one of the factors a court should consider, and certain cases, it may be a substantial factor."). CHI asserts this Circuit has at the very least implicitly embraced the holding and the investor return as a factor rationale of <u>Owensby & Kritikos,</u> supra. The citation given includes reasonable returns to shareholders as one of the valid reasonable compensation factors to at least consider. The court below did not do so, and repudiated balancing shareholder returns reflected in CHI's undisputed financial evidence.

The court below discarded the reasonable return to the shareholders factor consideration because of his belief that corporations should issue dividends. Since CHI has never done so, the court found compensation for Mr. Hood during 2015 and 2016 to be partially hidden dividends. That conclusion ignored some important evidence about CHI. It was undisputed that Mr. Hood, as CEO, was concerned about retaining earnings so CHI could consistently upgrade its fleet of heavy equipment,

so it had the cash on hand to finance itself during long jobs during which payment would be slow, and so it could handle economic downturns. He also believed that having the company increase in value via increased shareholders' equity was preferable to paying dividends. His rationale was both reasonable and is supported by case law.

Consider <u>Kennedy v. Commissioner</u>, 671 F.2d 167 (6th Cir. 1982). Some facts in Kennedy are dissimilar to those at bar. But there is a section of the opinion dedicated to analyzing a company refraining from dispersing dividends while achieving high financial performance. The Court notes that "non-payment of dividends by a close corporation is a factor which may indicate that compensation is unreasonable … [h]owever that alone is not determinative." *Id.* at 176. The court held that "where compensation paid to officers bears no relation to stockholdings, it tends to show that amounts paid were actually compensation and not disguised dividends." *Id.* at 174.

Thus, given the growth of the Cherokee company (Kennedy's employer) and Kennedy's unique efforts in the growth and success of the company, the compensation was not unreasonable. Mr. Hood's decision to retain earnings rather than give a dividend is a valid business decision, and the compensation of Mr. Hood was not in relation to his ownership, but about his leadership, time, and investment into the company as found not by Mr. Hood, but by his outside CPA advisors. This

case also supports the notion that the court below should have considered the value to CHI of the increased value of the company because of its strong growth in retained earnings. In <u>Kennedy</u>, the facts reflected a six-fold increase over 10 years, and was found to be a good and acceptable shareholder return. CHI generated a sixfold increase in retained earnings in only six years for its shareholders.

To similar effect, <u>Mad Auto Wrecking, Inc. v. C.I.R.</u>, T.C. Memo 1995-153 (1995) discussed a taxpayer's failure to pay dividends and its relation to reasonable compensation. While conceding that failure to pay dividends may show that some amounts paid to a shareholder/employee may be a dividend, the Court said that nonpayment of dividends does not "automatically convert compensation that would otherwise be reasonable into a dividend." *Id.* at p. 8. This Court also quoted with favor the hypothetical investor test from <u>Owensby & Kriticos</u>. *Id.* p. 8. It also noted that "compensation is not unreasonable merely because a corporation pays an insubstantial portion of its earnings as dividends." *Id.* p. 8. The Court refused to substitute its judgment for that of the board of directors, finding that its decision not to pay dividends because it needed to retain the funds to grow.

The taxpayer's equity in <u>Mad Auto Wrecking</u> grew during the years in question from $100 to $408,810. The court found that the growth from equity of $100 to $408,810 would have satisfied a hypothetical investor. That growth was impressive, but it seems inconsequential compared to CHI's growth in shareholders'

equity from $5,550,877 in 2010 to $31,262,166 in 2016, which is a six-fold increase over that six-year period. Further, the <u>Mad Auto Wrecking</u> court dismissed the IRS expert report which compared the executive salary of the taxpayer's executives to businesses which the Court believed showed an "absence of significant information on other businesses similar to the taxpayer's " *Id.,* p. 9  This issue will be discussed below.

CHI believes that the cases discussed above show a clear trend in the case law that extraordinary CEO performance and concomitant generous compensation to other employees, together with fair and reasonable returns to shareholders in whatever form, must be viewed through the lens of what a reasonable investor would find acceptable. Looking at the case law discussed here, the trend in the law is that the countervailing factors (generous compensation to other employees, extraordinary CEO performance, hours worked, and the like) are analyzed and weighed through the <u>lens of a reasonable investor</u> and what the returns to shareholders were. The Tax Court, as a Court of national jurisdiction, fully embraces this view, particularly when the appellate court has not spoken directly to the hypothetical investor standard or factor. See <u>Haffner's Serv. Stations, Inc. v. Commissioner</u>, T.C. Memo 2002-38 (2002). The "lens perspective" is also embraced where increases in net earnings result in build up in net worth to the benefit of shareholders. Failing to consider the executive's compensation from the perspective

of an independent investor has been found to be legal error.  <u>Dexsil Corp. v. C.I.R.</u>, 247 F.3d 96 (2nd Cir. 1998).

The court below appears to have ignored shareholder returns (that is, the extraordinary return on equity of 22% for 2015 and 36% for 2016, as the parties stipulated) and the sixfold retained earnings buildup, and gave pure lip service to the other countervailing factors favoring CHI. Instead, it placed 100% of the analysis on industry norms despite <u>Home Interior's</u> admonition not to do so.  <u>Herold Marketing</u> and <u>Home Interiors</u> both gave industry norms of like executive compensation zero analytical value, as echoed by <u>Pulsar</u> and <u>Kennedy</u>. And the reason for this trend is simple: it is a market-based standard applying the lens of an independent investor. The result of this legal trend is putting real, current financial data about the taxpayer ahead of easily manipulated industry norms surveys.

The court below credited Mr. Hood with CHI's exponential growth but asserted that the success would have been "fleeting" had it not been for the work of other executives of the company. CHI believes that the work of its executives other than Mr. Hood are important and represent the future of the company. Yet the court's conclusion about the fundamental and permanent transformation of the company is not supported by the evidence. Mr. Painter and Mr. Phillips both testified that they were taken aback by Mr. Hood's decision to drop Walmart work and feared that they would lose their jobs because the company would have no work. It was Hood's

decision alone, and the evidence of the company's permanent burgeoning success post-Walmart speaks for itself. The Tax Court's erroneous characterization of CHI's success as "fleeting" belies Mr. Hood's unilateral decision to move away from Walmart, which transformed CHI from a single digit profit margin company into a company with gross profit margins over 30%, yielding record profits. (JA1450). Mr. Hood deserves 100% full credit for that unilateral "skyrocketing" outcome, just as the Tax Court acknowledged. Trial Exhibit 54-J (JA1766), a one- page exhibit, makes that abundantly clear. It shows CHI's company-wide gross profit margins jumping from 6.9% in 2011 to 32.09% in 2016. Mr. Phillips gave uncontroverted testimony that CHI had its fifth good year and he then realized "we're going to keep going. I'm no longer the naysayer. And I stand corrected on that." (JA281).

CHI's 2015 numerator of $7,088,529 divided by total assets of $39,390,891 is a return of 18% compared to RMA industry average returns of 6.5%. This performance placed CHI at the 80th return percentile, as Mr. Fuller says. For 2016, CHI's numerator of $14,537,867 of pre-tax earnings divided by total assets of $53,208,339 yields pre-tax earnings return on total assets of 27.32%, compared to the RMA industry average of 5.9%. This result places CHI in the 90th percentile of pre-tax return on total assets measurement, as Mr. Fuller acknowledges (Ex. 101-R, Sch. A.5, Sch. A.6, JA1978-1980). Even Respondent's expert appreciates how well CHI outpaced the marketplace in terms of net pre-tax profits as a return on total

assets. CHI submits that is also a reasonable measurement under the independent investor test. Mr. Fuller's high percentile ranking of CHI's performance and return on assets, is enough to prove CHI met the independent investor test, and the company's actual return on equity ("ROE") and retained earnings data is sufficient without the need for CHI's own expert evidence. Choate Constr. Co. v. C.I.R., T.C. Memo 1997-495 (1997) (25% return on equity is inherently satisfactory to an independent investor). Webster Tool & Die, Inc. v. C.I.R., T.C. Memo 1985-604 (1985) (Lack of dividends and large bonus notwithstanding, a passive investor would be satisfied with a 17.6% and 30.66% returns on equity as based on the IRS's submitted calculations).

Moreover, CHI's book after-tax ROE inherently satisfies the level of returns authoritatively recognized as intrinsically sufficient by the Courts, without even the need to resort to market or industry comparisons. In Elliott's, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), the Ninth Circuit approved as a legal threshold, an intrinsic baseline return on shareholder equity of 20% meets the independent investor standard. It noted that "it seems clear that [a rate of 20%] rate of return on equity would satisfy an independent investor, and would indicate that Taxpayer and Elliott were not exploiting their [corporate/shareholder] relationship." 716 F.2d at 1247. Likewise, in H.W. Johnson, Inc. v. Commissioner, T.C. Memo 2016-95 (2016), the Commissioner claimed that having an ROE in line with the industry

average was insufficient, because an independent investor would demand a return more commensurate with petitioner's superior performance. The taxpayer argued that matching industry average ROE was sufficient. The Tax Court sided with the taxpayer and noted that:

> Respondent cites no authority for the proposition that the required return on equity for purposes of the independent investor test must significantly exceed the industry average when the subject company has been especially successful, and we have found none in the caselaw. Instead, in applying the independent investor standard test the courts have typically found that a return on equity of at least 10% tends to indicate that an independent investor would be satisfied and thus payment of compensation that leaves that rate of return for the investor is reasonable. . . . Indeed, compensation payments that resulted in a return on equity of 2.9% have been found reasonable. . . . We consequently find that Petitioner's returns on equity of 10.2% and 9% for 2003 and 2004, respectively, tend to show that the compensation paid to [the executives] for those years was reasonable.

Id. at *24 (internal citations omitted) (emphasis added).

CHI need not resort to a ROE baseline of 10% because its ROE levels were close to 22% for FYE 2015 and 36% for FYE 2016, which are return levels far superior to that baseline. As explained aptly in Exacto Spring Corp. v. Commissioner:

> If the rate of return is extremely high, it will be difficult to prove that the manager is being overpaid, for it will be implausible that if he quit if his salary was cut, and he was replaced by a lower- paid manager, the owner would be

better off; it would be killing the golden goose that lays the golden egg.

196 F.3d 833, 838 (7th Cir. 1999).

Given CHI's superior ROE levels for FYE 2015 and FYE 2016 and its increased revenues, gross margins, and net after-tax income, an independent investor would be satisfied. This factor supports a finding that Hood's compensation in those years was reasonable.

### III. Did the trial court commit clear error in concluding that the rationale for the bonuses in question was to pay disguised dividends?

Using so-called "cherry-picking" is a well-known logical fallacy. Simply put, this type of logical error occurs when an author, in this case, a trial judge, points to data that appears to confirm one's opinion, while ignoring directly contradictory data. This type of logic is not scientific. The Fourth Circuit reviews lower court's factual findings for clear error and any legal conclusions de novo. United States v. Hall, 664 F.3d 456, 462 (4th Cir. 2012). When reviewing evidentiary findings, the guiding Supreme Court precedent is Anderson v. Bessemer City. 470 U.S. 564, 573 (1985). This case sets a standard of deference to a lower court's interpretation of facts or testimony so long as the "court's account of the evidence is plausible in light of the record viewed in its entirety." But this deference is lost if the lower court disregards the entire body of evidence. The Fourth Circuit has adopted this standard of "plausibility in light of the record viewed in its entirety" in several cases. See

Hall, 664 F.3d at 462; <u>United States v. Antone</u>, 742 F.3d 151, 169 (4th Cir. 2014) ("When the court's account of the evidence is not plausible in light of the record viewed in its entirety, then it is not entitled to deference upon our review." )(internal quotation marks omitted)).

This record is heavily laden with evidence that contradicts the court's suggestion that the cause of Mr. Hood approval of large bonuses in 2015 and 2016 was his desire to conceal dividends that an examination of the testimony merits this Court's consideration. The chart below shows Mr. Hood's testimony on his rationale for agreeing to approve the bonus compensation recommended by his management and accountants.

| Joint Appendix Page and Line References | Supporting Testimony:  Direct or Cross |
|---|---|
| JA595, lines 1-15 | Clary Hood:  Your honor, I was told by people that I paid a lot of money to advise me on tax and financial matters since I'm not strong in that at all. And I never thought I really needed, and I wanted the company to grow. But then I realized that I have been not compensated as much as some people in our industry. |
|  |  |
| JA557, lines 11-25 | Mr. Wilder:  Were you the one who brought up a bonus?<br><br>Mr. Hood: [no] Someone else thought of it.<br><br>Mr. Wilder:  When you heard about [the bonus], did anyone explain to you what the rationale was for giving this bonus? |

| | |
|---|---|
| | Clary Hood, line 11: "Yeah. There was some talk about the Company has done so well and I have – Elliott Davis and the room there, those are the people in the room the other people being Chris, and Tammy and Jeff was there. They said that I had not been paid in times earlier, and that I needed to get caught up, my salary, because it was so much lower that what it should have been with the company doing as well as it has.

Mr. Wilder, line 20: Hearing that rationale, did you agree with the idea that you would get the bonus?

Clary Hood, line 21: "In a sense no. But then again I do know that I should have been paid more. And here again, being my wife always telling me she said you work all the time. And we had money, but I wanted it in the company for - I guess I was selfish is what it comes to.

Mr. Wilder: Was selfish for wanting it in the Company?

Clary Hood: Yes. Because that way the company could grow and it could keep growing. But then again I realized too that my family, they suffered through a lot of things throughout the years. So it took all my time, but I used to carry my kids with me a few times. But they wasn't interested in it.

Mr. Wilder:

Minutes, read them, did you think it is it all true?

Clary Hood: Yes, I did. |
| | |
| JA560-561, Lines 1-19 | Mr. Wilder: My question for you is do you believe that you were worth the bonus? |

| | |
|---|---|
| | Clary Hood: |
| | Yes. Were they a response from Elliott Davis and our accounting team? Yes. Because they said it, so I guess we'll believe it. |
| | Mr. Wilder: <br> In other words, you got advice from Mr. Phillips and Elliott Davis, and you believed them. And so you went along with it? |
| | Clary Hood: I did. |
| | Mr. Wilder:  And when the company become more profitable, from 2012 on, is it true to say that the bonuses for the line employees went up dramatically? |
| | Clary Hood:  Yeah, and it had to do with my decision alone. |
| | |
| JA594 | The Court, line 20: <br> You wanted historically to keep the money in the company. I think from the status of the company it was a good investment and all that. <br> When they proposed a significant bonus to you at the end of the year, you said your wife was kind of wanting more of the money of the money to be invested in the company. |
| | Clary Hood:  The two-part answer, first positive, second negative. |
| | |
| JA598-599 | The Court:  Did you historically before 2015 or 2016 on bonuses, weigh in on that decision of the number should be or [did] you allowed others to make that number and you— |
| | Clary Hood: |

| | |
|---|---|
| | I let the accountants – they would come up to – and we'd all sit around. And they'll bring it up. And I would not ask to that kind of money. I mean, for money to go – so they the ones advising me. And I take their advice on how much. And so it's not my decision sir.<br><br>The Court:<br>The accountants would be the ones kind of determining your bonus.  That's great. |

In <u>Anderson</u>, the Supreme Court said deference to a trial judge's findings is called for if it is "plausible," meaning that if there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. But if there are not two permissible views, the judge cannot cherry-pick and distort the evidence by choosing one piece of evidence and discarding the rest.  As seen above, there was considerable and uncontroverted testimony from Mr. Hood about his motivation and decision-making protocol for allowing those bonuses. The twisting of Mr. Hood's testimony to say he had motivations for a bonus other than what Elliott Davis recommended contradicts the judge's own explicit observation and bench fact-finding at the end of that testimony – "<u>the accountants would be the ones kind of determining your bonus, that's great</u>."

**IV.** **The trial judge found that for 2015, CHI had good cause and reasonable reliance in its tax advisors as a penalty defense under Internal Revenue Code Sections 6662 and 6664. The record contains undisputed testimony that the same level and type of tax advice was communicated by CHI's advisors for its 2016 year and tax return. Was the failure of the trial judge to find the reliance defense to Code Section 6662 for 2016 clearly erroneous?**

In United States v. Boyle, the Supreme Court explained:

When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of the advice of a presumed expert in the first place. . . .

469 U.S. 241, 251 (1985).

Reasonable cause and good faith reliance on an advisor exists where (1) a taxpayer engages a competent advisor with sufficient expertise to justify reliance; (2) the taxpayer gives the advisor the necessary and accurate information to render advice; and (3) the taxpayer actually relies in good faith on the advisor's judgment and advice. *See* *Neonatology Assocs. P.A. v. Comm*issioner, 115 T.C. 43, 99 (2000).

The trial Court found reasonable reliance in good faith by CHI for its 2015 year to negate the penalty. Yet it refused to waive the penalty for 2016 even though the uncontroverted testimony of the same witnesses the Court found fully credible for waiving the penalty for 2015 unanimously testified that the very same analysis, protocol, bonus decision-making and advice communicated by Elliott Davis to CHI for 2015 was the identical exercise. See the uncontested and consistent testimony

about the 2016 advice of Elliott Davis from Mr. Phillips (JA332-336; Ex. 70-J, JA1857); Mr. Stokes (JA631-633; JA672-673; JA678); Mr. Greenway (JA723; JA730-731; JA736-738); Mr. Hood (JA392; JA560; JA556-557; JA595). The trial judge explicitly found that every one of these outside advisors as witnesses at the hearing were credible. (JA1511).

V. **The U.S. Tax Court regards as irrelevant the location of circuit courts of appeals decisions as case law authority in assessing the tax penalty defense of "substantial authority." It also uses a nationwide approach of considering shareholder returns as a "lens" through which the other factors of reasonable compensation are viewed and analyzed. Did the trial judge commit legal error in refusing to find that "substantial authority" existed as another defense to penalties against CHI under Code Section 6662?**

Under IRC § 6662(d)(2)(B), the amount of tax understatement in applying substantial understatement penalties "shall be reduced" by that portion of the understatement attributable to the tax treatment of any item by the taxpayer if there is or was "substantial authority" [emphasis added] for such treatment. Substantial authority means that the weight of authorities is substantial in relation to the weight of authorities supporting contrary treatment, Treas. Reg. § 1.6662-4(d)(3), but is less stringent than the more likely than not standard, and more stringent than the reasonable basis standard. Treas. Reg. § 1.6662-4(d)(2). Since this is an objective standard, the taxpayer's belief whether substantial authority exists is not relevant. Treas. Reg. § 1.6662-4(d)(3)(i). The types of authority include "court cases." Treas.

33

Reg. § 1.6662-4(d)(3)(iii). Most important, the applicability of court cases to the taxpayer because of the taxpayer's residence in a particular jurisdiction is not considered in determining whether there is substantial authority for the tax treatment of an item, Treas. Reg. § 1.6662-4(d)(3)(iv)(B). Since the taxpayer has a right to look across the boundary lines from one Circuit Court of Appeals to another, CHI strongly asserts that the Seventh Circuit decisions in the <u>Menard</u> and <u>Exacto Spring</u> as well as <u>Dexil</u>, <u>Elliott's</u>, <u>Ownensby</u>, <u>Kennedy</u>, and <u>Home Interiors</u>, and including the TCM decisions (<u>Sunbelt</u>, <u>Pulsar</u>, <u>Haffner's</u>, <u>Herold Marketing</u>, and <u>Choate</u>) and a plethora of other cases provide clear cut substantial authority under the independent investor test, whether as a factor, a "lens" factor or as a "presumptive" factor. The "lens" analysis as applied by the U.S. Tax Court as a court of national jurisdiction is well established. <u>Haffner's</u>, supra. Moreover, Stacy Stokes considered the <u>H.W. Johnson</u> and <u>Elliott's</u> cases as support for his return on equity analysis. That alone shows that at the time of the analysis and now there is ample authority to support the compensation deductions related to Hood's compensation for FYE 2015 and FYE 2016.

**VI.    The Court should consider adoption of the Seventh Circuit's presumptive standard for investor returns under <u>Menard</u> to deter reasonable compensation litigation under similar circumstances.**

CHI urges the Court to consider adoption of the hypothetical investor "presumptive" standard of reasonable investor returns embraced by the Seventh Circuit, in Menard, Inc., v. Commissioner, 560 F.3d 620 (7th Cir. 2009). Doing so will deter litigation and tax controversies in this area of the tax law. According to the General Accounting Office, reasonable compensation disputes have been one of the two most often litigated categories of disputes in the Tax Court (the other being the adequate documentation of business expense deductions), see General Accounting Office, "*Tax Administration: Recurring Issues in Tax Disputes Over Business Expense Deductions*" (September 1995); Mad Auto Wrecking, Inc. v. Commissioner, T. C. Memo 1995-153, at 5 (1995) (…"this and other courts are repeatedly asked to reexamine the relevant facts of the business and the underlying employment relationship to render an opinion on whether the compensation paid was reasonable"). This is one of the most hotly litigated types of federal income cases encountered by the U.S. Tax Court. Much of the controversy stems from ongoing controversy and uncertainty surrounding the reasonable return or hypothetical investor standard as a factor versus presumptive test in reasonable compensation cases. The CHI submits that a brighter lined presumptive test would deter the Internal Revenue Service from taking overly aggressive postures against privately-held, entrepreneurial corporate taxpayers, which do not have available the significant litigation resources of Fortune 500 publicly traded companies, and for

whom litigation in this arena is burdensome. Perhaps as importantly, adopting the presumptive hypothetical investor standard used in the Seventh Circuit would encourage the IRS to focus on the true merits of each taxpayer, based on economic performance, profitability, and its attribution to executive skills and decisions. The alternative is to rely on placement of undue weight on statistically dubious "like industry surveys" cobbled together to show run of the mill industry executives compensation that give no credit to or allowance for the extraordinary performers recognized in <u>Home Interiors</u> and cases applying it.

An example of the government's level of aggression in these cases is its zealous pursuit of penalties where they simply are not appropriate. The IRS's internal guidelines make clear that in reasonable compensation cases, where the amounts of officer compensation at issue have been disclosed on a properly completed Schedule E of the income tax returns at issue, the Service is not supposed to assert tax penalties. CHI made the proper disclosures on its income tax returns for 5/31/15 (JA1535) and 5/31/16 ((JA1594). Still, the IRS asserted tax penalties. See Rev. Proc. 92-23, 1992-1 C.B.737, sec/4(b)(4). That the Internal Revenue Service aggressively did so here suggests either its hostility to reasonable compensation of entrepreneurial executives, or its disregard of its own internal procedures. For these reasons, CHI urges the Court to consider adoption of <u>Menard's</u> presumptive hypothetical investor standard versus just one of multiple factors. CHI asserted on

opening statement in the Tax Court hearing that this taxpayer's success represented a Horatio Alger success story (JA223), which Respondent – Appellee acknowledged in his closing statement at the trial hearing (JA1429-1430). The small to medium sized entrepreneurial business sector led by risk taking executives is one of the backbones of our nation's economy. Such companies should be treated as fairly under the tax law as larger enterprises.

## CONCLUSION

For foregoing reasons, CHI prays:

1.     That the Court reverse the Opinion and Judgment of the court below and grant judgment for CHI such that its deductions for Mr. Hood's compensation for 2015 and 2016 are allowed; and

2.     In the alternative, that the Court declare that CHI owes no penalty for tax year 2016.

**REQUEST FOR ORAL ARGUMENT**

CHI respectfully requests that the Court hear oral argument in this matter.

September 27, 2022

Respectfully submitted,

<div style="margin-left:50%">

_____/s/_____
William Curtis Elliott, Jr.
Stanton Paul Geller
Culp Elliott & Carpenter, P.L.L.C.
6801 Carnegie Boulevard
Suite 400
Charlotte, NC 28211
Phone: (704) 372-6322
Fax: (704) 414-2650
wce@ceclaw.com
spg@ceclaw.com

_____/s/_____
Raboteau Terrell Wilder, Jr.
Wilder Pantazis Law Group
3501 Monroe Road
Charlotte, NC 28205
Phone: (704) 342-2243
Fax: (704) 342-3266
rob@wilderlawgroup.com

*Counsel for Petitioner-Appellant*

</div>

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,776 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word 2010.

3.  This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because Malwarebytes Anti-Malware was run on the file containing the electronic version of this brief and no viruses were detected.

September 27, 2022 _____/s/_____

William Curtis Elliott, Jr.

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on September 27, 2022. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

I further certify that on September 27, 2022, a true and correct copy of the Brief of Defendants-Appellants was sent to the Clerk of Court via Federal Express.

September 27, 2022        _____/s/_____

                                     William Curtis Elliott, Jr.