# No. 22-1573

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CLARY HOOD, INC.,

Petitioner-Appellant

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee

## ON APPEAL FROM THE DECISION OF THE UNITED STATES
## TAX COURT

## BRIEF FOR THE APPELLEE

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

BRUCE R. ELLISEN                    (202) 514-2929
ROBERT J. BRANMAN                   (202) 307-6538
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

# TABLE OF CONTENTS

**Page**

Table of contents..................................................................i
Table of authorities ...........................................................iv
Statement of jurisdiction................................................... 1
Statement of the issues ..................................................... 1
Statement of the case ........................................................ 2

    A.    Clary Hood, Inc., and its business........................... 3

    B.    Mr. Hood's services to taxpayer and payments received ....... 4

    C.    Walmart work ...................................................... 7

    D.    The Tax Court's opinion...................................... 8

Summary of argument ........................................................ 12
Argument:

    I.    The Tax Court correctly determined the amounts of taxpayer's payments to Mr. Hood that were deductible under I.R.C. § 162 as reasonable compensation for services rendered.................................................... 17

        Standard of review ............................................ 17

    A.    I.R.C. § 162(a)(1) limits a corporation's deduction for compensation to an amount that is "reasonable" and for "personal services actually rendered" .................................. 17

    B.    Taxpayer failed to establish that the amounts it paid Mr. Hood in excess of the amounts allowed by the Tax Court were reasonable compensation for services rather than distributions of profits................................. 22

**Page**

1.  The Tax Court correctly considered all the relevant facts and circumstances as required by regulation and decades of caselaw ................................................ 22

    (1)   Mr. Hood's background and qualifications ........ 24

    (2)   Nature, extent, and scope of Mr. Hood's work ... 24

    (3)   Size and complexity of taxpayer's business ........ 25

    (4)   Comparison of taxpayer's income to Mr. Hood's compensation ........................................... 25

    (5)   Economic environment ........................................ 26

    (6)   Comparison of Mr. Hood's compensation with distributions to stockholders .............................. 27

    (7)   Compensation for comparable positions in comparable concerns ............................................ 29

    (8)   Taxpayer's salary policy as to all employees ...... 37

    (9)   Mr. Hood's compensation in prior years ............. 40

    (10)  Mr. Hood's personal guaranty of taxpayer's debts and bonding obligations .............................. 41

2.  The Court should reject taxpayer's invitation to adopt the independent-investor test ............................ 42

3.  Taxpayer's arguments lack merit ................................ 49

**Page**

II.    The Tax Court correctly upheld the substantial-understatement penalty imposed by the Commissioner for 2016 ......................................................................55

        Standard of review ................................................55

A.    Applicability of the substantial-understatement penalty ..................................................................55

B.    Taxpayer has not established any applicable defense to the penalty...........................................................57

       1.    Taxpayer has not established substantial authority for its deduction of excessive compensation.................................................57

       2.    Taxpayer has not established reasonable cause and good faith for its substantial understatement of tax in 2016.................................................61

Conclusion.........................................................................69
Statement regarding oral argument.....................................69
Certificate of compliance ...................................................70
Certificate of service .........................................................71

# TABLE OF AUTHORITIES

**Cases:**                                                     **Page(s)**

*Alexander Shokai, Inc. v. Commissioner,*
63 T.C.M. (CCH) 1870 (T.C. 1992), *aff'd,*
34 F.3d 1480 (9th Cir. 1994) .................................. 54

*Alpha Med., Inc. v. Commissioner,*
172 F.3d 942 (6th Cir. 1999) ....................... 25, 29-30, 40

*Antonides v. Commissioner,*
893 F.2d 656 (4th Cir. 1990) .................................. 55

*Aspro, Inc. v. Commissioner,*
121 T.C.M. (CCH) 1037 (T.C. 2021), *aff'd,*
32 F.4th 673 (8th Cir. 2022) .................................. 30

*Aspro, Inc. v. Commissioner,*
32 F.4th 673 (8th Cir. 2022) ..................... 17, 19, 25, 37

*B & D Foundations, Inc. v. Commissioner,*
2001 WL 1168133, 82 T.C.M. (CCH)
692 (T.C. 2001) .......................................... 21, 47

*B.B. Rider Corp. v. Commissioner,*
725 F.2d 945 (3d Cir. 1984) .................................. 59

*Barton-Gillet Co. v. Commissioner,*
29 T.C.M. (CCH) 679 (T.C. 1970) ............................ 22

*Baxter v. Commissioner,*
910 F.3d 150 (4th Cir. 2018) .................................. 61

*Biltmore Homes, Inc. v. Commissioner,*
288 F.2d 336 (4th Cir. 1961) .................................. 54

*Botany Worsted Mills v. United States,*
278 U.S. 282 (1929) ...................................... 20-21

*Charles Schneider & Co. v. Commissioner,*
500 F.2d 148 (8th Cir. 1974) .............................. 30, 59

*Chemtech Royalty Assocs., L.P. v. United States,*
823 F.3d 282 (5th Cir. 2016) .................................. 55

*City Chevrolet Co. v. Commissioner,*
228 F.2d 894 (4th Cir. 1956) .................................. 17

*Conti v. Commissioner,*
39 F.3d 658 (6th Cir. 1994) .................................. 68

**Cases (cont'd):** Page(s)

*Crosby v. United States,*
  496 F.2d 1384 (5th Cir. 1974) .............................................. 54

*Dexsil Corp. v. Commissioner,*
  147 F.3d 96 (2d Cir. 1998) ............................................. 43, 59

*Eberl's Claim Serv., Inc. v. Commissioner,*
  249 F.3d 994 (10th Cir. 2001) .................................. 22, 43, 59

*Eberl's Claim Serv., Inc. v. Commissioner,*
  T.C. Memo 1999-211, 1999 WL 429140, *aff'd,*
  249 F.3d 994 (10th Cir. 2001) .............................................. 37

*Elliotts, Inc. v. Commissioner,*
  716 F.2d 1241 (9th Cir. 1983) ........................................ 18, 43

*Est. of Kechijian v. Commissioner,*
  962 F.3d 800 (4th Cir. 2020) .......................................... 55, 61

*Est. of Kluener v. Commissioner,*
  154 F.3d 630 (6th Cir. 1998) .......................................... 55, 58

*Est. of Wallace v. Commissioner,*
  95 T.C. 525 (1990), *aff'd,*
  965 F.2d 1038 (11th Cir. 1992) ........................................... 21

*Exacto Spring Corp. v. Commissioner,*
  196 F.3d 833 (7th Cir. 1999) ......................... 20, 42-48, 59-60

*Haffner's Serv. Stations, Inc. v. Commissioner,*
  326 F.3d 1 (1st Cir. 2003) ........................................ 18, 44, 60

*Helvering v. Nat'l Grocery Co.,*
  304 U.S. 282 (1938) ......................................................... 36

*Home Interiors & Gifts, Inc. v. Commissioner,*
  73 T.C. 1142 (1980) .................................................. 37, 51-52

*Klamath Strategic Inv. Fund v. United States,*
  568 F.3d 537 (5th Cir. 2009) .............................................. 61

*Lucas v. Ox Fibre Brush Co.,*
  281 U.S. 115 (1930) ......................................................... 21

*Martens v. Commissioner,*
  1991 WL 87160, 934 F.2d 319 (4th Cir. 1991) ..................... 22

*Mayson Mfg. Co. v. Commissioner,*
  178 F.2d 115 (6th Cir. 1949) ......................................... 22-23

*Menard, Inc. v. Commissioner,*
  560 F.3d 620 (7th Cir. 2009) .............................................. 47

**Cases (cont'd):**                                            **Page(s)**

*Miles-Conley Co. v. Commissioner,*
    173 F.2d 958 (4th Cir. 1949) ...................17, 21, 27-28, 40-41

*Miller Mfg. Co. v. Commissioner,*
    149 F.2d 421 (4th Cir. 1945) ..........................................22, 51

*Mills v. Commissioner,*
    399 F.2d 744 (4th Cir. 1968) .................................................68

*Modernage Devs., Inc. v. Commissioner,*
    66 T.C.M. (CCH) 1575 (T.C. 1993), *aff'd,*
    52 F.3d 310 (2d Cir. 1995) .....................................................65

*Mulcahy, Pauritsch, Salvador & Co. v. Commissioner,*
    680 F.3d 867 (7th Cir. 2012) .....................................18, 47-48

*Nor-Cal Adjusters v. Commissioner,*
    503 F.2d 359 (9th Cir. 1974) .................................................38

*Owensby & Kritikos, Inc. v. Commissioner,*
    819 F.2d 1315 (5th Cir. 1987) .................23, 37, 40-41, 44, 51

*Rapco, Inc. v. Commissioner,*
    85 F.3d 950 (2d Cir. 1996) ....................................................40

*Richlands Med. Ass'n v. Commissioner,*
    1992 WL 14603, 953 F.2d 639
    (4th Cir. 1992) ......................................22, 36, 44, 59

*Richlands Med. Ass'n v. Commissioner,*
    60 T.C.M. (CCH) 1572 (T.C. 1990), *aff'd,*
    953 F.2d 639 (4th Cir. 1992) .................................................27

*Roberts v. Commissioner,*
    981 F.2d 1251 (4th Cir. 1992) ..............................................54

*Rutter v. Commissioner,*
    52 T.C.M. (CCH) 326 (T.C. 1986), *aff'd,*
    853 F.2d 1267 (5th Cir. 1988) ..............................................30

*Rutter v. Commissioner,*
    853 F.2d 1267 (5th Cir. 1988) ..............................................29

*Sparkman v. Commissioner,*
    509 F.3d 1149 (9th Cir. 2007) ..............................................68

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
    988 F.3d 690 (4th Cir. 2021) .................................................51

*Swayze v. United States,*
    785 F.2d 715 (9th Cir. 1986) .................................................61

**Cases (cont'd):** Page(s)

*United States v. Smith,*
  418 F.2d 589 (5th Cir. 1969) .................................. 18

*Welch v. Helvering,*
  290 U.S. 111 (1933) ............................................ 21

*Whitehouse Hotel Ltd. P'ship v. Commissioner,*
  615 F.3d 321 (5th Cir. 2010) .................................. 36

*Zfass v. Commissioner,*
  118 F.3d 184 (4th Cir. 1997) .................................. 62

**Statutes:**

Internal Revenue Code (26 U.S.C.):

§ 11(a) ........................................................... 17
§ 63(a) ........................................................... 17
§ 162 .................................................. 2, 12, 17, 18
§ 162(a) ............................................................ 9
§ 162(a)(1) ........................... 1, 17, 19, 20, 21, 59
§ 311(a) .......................................................... 18
§ 316(a) .......................................................... 18
§ 6213(a) ........................................................... 1
§ 6214 .............................................................. 1
§ 6662 ................................... 2, 10, 55-57, 61
§ 6662(a) ......................................................... 55
§ 6662(b)(2) ...................................................... 55
§ 6662(d)(1)(B)(i) ................................................ 56
§ 6662(d)(2)(B) ................................................... 56
§ 6662(d)(2)(B)(i) ......................................... 15, 56, 58
§ 6662(d)(2)(B)(ii) ........................................... 56, 57
§ 6664 .............................................................. 3
§ 6664(c) ......................................................... 56
§ 6664(c)(1) ................................................ 16, 56, 61
§ 7442 .............................................................. 1
§ 7482(a) ........................................................... 1
§ 7483 .............................................................. 1

**Statutes (cont'd):**                                    **Page(s)**

Omnibus Budget Reconciliation Act of 1989,
 Pub. L. 101-239, § 7721(a), 103 Stat. 2395 ............................ 57

Omnibus Budget Reconciliation Act of 1993,
 Pub. L. 103-66, § 13251(a), 107 Stat. 312 ............................ 57

**Regulations:**

Treasury Regulations (26 C.F.R.):

§ 1.162-7(a) ................................................................ 12, 19, 45
§ 1.162-7(b)(1) ................................................................ 17, 19
§ 1.162-7(b)(3) ................................................................ 21, 29, 46
§ 1.162-8 ................................................................ 54
§ 1.167-7(b)(3) ................................................................ 15
§ 1.6662-3(b)(3) ................................................................ 56, 58
§ 1.6662-4(d)(2) ................................................................ 58
§ 1.6662-4(d)(3)(i) ................................................................ 58
§ 1.6662-4(d)(3)(ii) ................................................................ 58
§ 1.6662-7(c) ................................................................ 57
§ 1.6664-4(b)(1) ................................................................ 61

**Miscellaneous:**

Anne E. Moran, *Reasonable Compensation*, 390 Tax Mgmt.
 Portfolio (Bloomberg BNA) (6th Ed. 2021) ............................ 20

Rev. Proc. 92-23, 1992-1 C.B. 737 ................................................ 57

Stetson, *Courts Don't Follow: Reasonable Compensation
 Rulings and the Exacto Spring Approach,*
 15 Chap. L. Rev. 343 (2011) ................................................ 47

Tax Ct. Rule 142(a) ................................................................ 21

## STATEMENT OF JURISDICTION

On December 3, 2018, the IRS issued a notice of deficiency to Clary Hood, Inc. ("taxpayer") for its tax years ended May 31, 2015, and May 31, 2016. The IRS issued a corrected notice of deficiency on or about February 1, 2019. (JA149.) Taxpayer timely petitioned the Tax Court for redetermination of the deficiencies on February 12, 2019. (JA150.) *See* I.R.C. (26 U.S.C.) § 6213(a). The Tax Court had jurisdiction over the petition under I.R.C. §§ 6213(a), 6214, and 7442.

The Tax Court entered a final decision resolving all claims of all parties on May 12, 2022. (JA1516.) Taxpayer filed a timely notice of appeal on May 18, 2022, within 90 days after the entry of the decision. (JA1518-1519.) *See* I.R.C. § 7483. This Court has jurisdiction under I.R.C. § 7482(a).

## STATEMENT OF THE ISSUES

1. Whether the Tax Court correctly found that taxpayer had not met its burden of proving that all of the compensation it paid Mr. Hood was deductible under I.R.C. § 162(a)(1) because the compensation was not reasonable in amount.

2.     Whether the Tax Court correctly found that taxpayer was liable for a penalty for 2016 because its understatement of tax was substantial pursuant to I.R.C. § 6662 and it did not establish a defense to the penalty.

## STATEMENT OF THE CASE

Taxpayer petitioned the Tax Court to challenge income tax deficiencies and penalties determined by the IRS for the years ending May 31, 2015, and May 31, 2016 (hereafter the 2015 and 2016 tax years).  (JA15.)  For 2015, taxpayer had  reported $5,711,105 as deductible compensation for Mr. Hood, but the IRS determined that only $517,964 was deductible under I.R.C. § 162 as reasonable compensation for services rendered.  For 2016, the IRS allowed $700,792 of the $5,874,585  taxpayer reported.  After a six-day trial, the Tax Court issued an opinion (JA1452-1515) and a decision (JA1516) redetermining taxpayer's deficiencies.  The Tax Court found that the amounts deductible as reasonable compensation were $3,681,269 for 2015 and $1,362,831 for 2016.  The court relieved taxpayer of the penalty for 2015, finding that taxpayer had relied on  professional advice and thus established a reasonable-cause defense pursuant to

I.R.C. § 6664.  The Tax Court sustained the penalty for 2016 because taxpayer did not establish any defense.

## A.    Clary Hood, Inc., and its business

Taxpayer Clary Hood, Inc., was incorporated in 1980 by Clary Hood and his wife, Gail Hood.  (JA151.)  At all times during June 1, 1999, through May 31, 2016 (referred to by the parties and the Tax Court as the "review period" (JA151, JA1458)), Mr. and Mrs. Hood were the sole shareholders and the sole members of taxpayer's board of directors.  (JA154.)

Taxpayer's business was land grading and excavation services for construction projects.  (JA152.)  Its principal place of business was in South Carolina, but it also conducted business in several other states. (JA152.)

Taxpayer's financial success during the review period was mixed. A table showing taxpayer's net income before taxes during the review period shows that for the first twelve years (2000-2011) taxpayer had six years of net income and six years of losses.  Beginning in 2012 and continuing through 2016 taxpayer had steady and increasing success.

(JA176-177.) Taxpayer did not, however, pay any cash dividends to shareholders at any time during the review period. (JA154.)

In October 2018, taxpayer's business was acquired by a newly formed operating company named Clary Hood & Associates, Inc. The new entity was owned by Mr. Hood and two of taxpayer's other officers, Andy Painter and Justin Pearson. (JA155, JA1673-1689.) The shareholder's agreement provides that Mr. Hood can require Painter and Pearson to purchase all his remaining shares (JA1680, ¶ 9), suggesting that the parties contemplated a complete "changing of the guard."

## B.   Mr. Hood's services to taxpayer and payments received

During the review period, taxpayer had no written employment agreement with Mr. Hood. (JA155.) Mr. Hood performed a variety of functions for taxpayer, including managing its equipment, repairing heavy equipment, supervising repair mechanics, preparing grading job estimates and bids, submitting and negotiating job bids, and obtaining bonding for job bids. He was also involved in the daily management of employees in both the office and the field, including supervision of job

sites and equipment repair. He was also responsible for procurement and disposition of taxpayer's heavy equipment. (JA155-158.)

Mr. Hood had generally taken a modest salary during the early years of the review period, but beginning in 2013 several events occurred to spur him to take more money out of the business. Mr. Hood was about 65 years old in 2013. (JA152.) He had previously employed his son, Wesley, and both hoped that Wesley would be able to take over the business, but by 2013 it was clear that it was not going to work out. (JA542, JA553-554.) Mr. Hood acknowledged at trial that by 2015 he understood that he "needed to start making some preparations" to take money out of the corporation, and "with health matters, I knew I needed to prepare for a changing of the guard." (JA595.) And taxpayer's profits increased sharply in 2012 and again in 2013 and remained high through 2016. (JA176-177.)

The total compensation taxpayer paid Mr. Hood during the review period thus increased more or less in tandem with taxpayer's profits. In the years 2000-2012 his compensation went down and up and back down, ranging between $127,000 and $450,000 per year. It generally decreased during taxpayer's loss years (2001-2003), then rose during

more profitable years (2004-2008), then decreased again during another spate of loss years (2009-2011), then rose again beginning in 2012. (JA96, JA176-177.) Finally, when net income rose sharply during the years 2013-2016, taxpayer raised Mr. Hood's compensation to $1.3 million in 2013, $1.6 million in 2014, $5.1 million in 2015, and $5.2 million in 2016. (JA96, JA352-353.) Taxpayer also paid Mr. Hood bonuses in 2017 and 2018 of $5,000,000 and $6,000,000, respectively, which it also characterized as deductible compensation. (JA377-378.) During some years taxpayer also made payments to third parties that it conceded should be considered as compensation to Mr. Hood for purposes of some of the calculations in this suit. These payments were made to two of Mr. Hood's adult children (who did not perform services for taxpayer), and to taxpayer's employees and outside accountants for doing personal work for Mr. Hood. (JA196-202.)

The large increases in compensation for the years at issue, 2015 and 2016, both came in the form of $5 million bonuses. In each case, the bonus was approved by taxpayer's board of directors, consisting of only Mr. and Mrs. Hood, shortly before taxpayer's May 31 fiscal year end. (JA187-188, JA1845, JA1857.)

Taxpayer did not issue similar bonuses to its three executives who were not shareholders, Andy Painter, Chris Phillips, and Tom Addley. (JA168.)

### C.    Walmart work

For much of the review period a portion of taxpayer's revenues were earned as a subcontractor to developers of Walmart shopping centers.  The parties stipulated that between June 1, 1999, and May 31, 2011, "revenue from Walmart shopping center projects ranged from less than 1% to more than 52% of [taxpayer's] annual revenue for each year and accounted for more than 20% of [taxpayer's] annual revenue in most of those years."  (JA172.)  In 2011, taxpayer ceased seeking out new Walmart projects and began winding down its existing Walmart projects, which continued through its 2013 fiscal year.  (JA174.) Taxpayer did some work directly for Walmart, but was primarily a subcontractor to general contractors building Walmart stores.  (JA174, JA586-587.)

Several of taxpayer's factual assertions regarding its Walmart work appear to be careless misstatements of the record.  Taxpayer asserts that "[f]or several decades, CHI made most of its money doing

grading and excavation for new Walmart stores." (Br. 5.) The evidence of taxpayer's Walmart-related revenues does not span "several decades," but includes only the years 2000-2016. Of those years, its Walmart-related revenues exceeded 50% of its total revenues only in 2000 (50.8%) and 2007 (52.6%). (JA173.) Thus, the record does not support taxpayer's assertion that it made "most" of its money "for several decades" working on Walmart projects.

Taxpayer's further assertion that "Walmart gradually reduced the profit margins it would pay CHI" (Br. 5) is also incorrect because taxpayer generally worked as a subcontractor to shopping-center developers rather than contracting directly with Walmart. Thus, taxpayer stipulated that the work it did "for Walmart related shopping center developers" wound down beginning in 2011, when "the Walmart shopping center developers" with which it contracted "requested bid reductions." (JA174, JA586-587.)

## D.    The Tax Court's opinion

The case was tried over six days in March 2021. The parties submitted an extensive stipulation of facts (JA148-205) and approximately 100 exhibits. In addition to fact witnesses, taxpayer

called two expert witnesses (Theodore Sharp and Samuel Kursh) and the Commissioner called one expert witness (David Fuller).

The Tax Court issued its opinion in March 2022. (JA1452.) It employed a widely-used multifactor test to determine whether taxpayer had deducted compensation paid to Mr. Hood in excess of an amount allowable under I.R.C. § 162(a). (JA1472-1473.) It observed that some courts of appeals had "supplemented, hybridized or completely replaced" the multifactor approach with the "so-called independent investor test." (JA1473.) It rejected taxpayer's contention that it should apply the independent-investor test in this case, stating that the Tax Court generally applies the multifactor approach unless the case is appealable to a court of appeals that has expressly applied the independent-investor test. (JA1474-1475.) Since this the Tax Court "has not adopted any iteration" of the independent-investor test, the court determined that it would apply the multifactor approach. (JA1475.)

The Tax Court then considered ten of the commonly-considered factors to evaluate the reasonableness of the compensation paid to Mr. Hood. (JA1477-1503.) It noted that the parties did not dispute that Mr.

Hood was entitled to additional compensation for the services he rendered as an employee in 2000-2014. It found that the report of the Commissioner's expert, Fuller, "most accurately accounted for all known amounts" and contained detailed disclosures of data sources, methodologies, and supporting calculations. Fuller's data spanned the entire 17-year review period, with appropriate comparisons for taxpayer's annual assets and revenues, and placed taxpayer's performance within appropriate quartiles. (JA1490-1491.)

The court noted that Fuller's report contained "primary" and "alternative" opinions, distinguished by the inclusion or omission of additional compensation for Mr. Hood's guarantees of taxpayer's surety bonds. The Tax Court adopted Fuller's "primary" opinion, which added the compensation for those guarantees. (JA1504 n.29.)

The Tax Court next considered the penalty under I.R.C. § 6662 for underpayment of tax attributable to a substantial understatement of income tax. Taxpayer's stated reason for paying Mr. Hood a $5 million bonus in 2015 was that he had been undercompensated in prior years. Although Fuller ultimately concluded that the total amount of undercompensation for the years 2000-2014 was only $2.3 million, the

court found that taxpayer's financial officer, Chris Phillips, had made a reasonable and good-faith effort to convey his computations and theory to taxpayer's outside accountants and relied on their advice in determining that the $5 million bonus payment in 2015 was reasonable. (JA1510.) However, taxpayer produced "almost no evidence" with respect to advice it may have received about the appropriateness of paying Mr. Hood and deducting another $5 million bonus payment in 2016, and that absence was critical because taxpayer did not produce any evidence that it still believed Mr. Hood had been historically undercompensated even after the 2015 bonus payment. (JA1512.)

The Tax Court also rejected taxpayer's alternative argument that it was protected from the penalty for 2016 because there was substantial authority for its position. The court held that the Seventh Circuit's endorsement of the independent-investor test was not sufficient authority given that it is the only circuit to hold that a taxpayer may rely on that test exclusively and this Court has previously applied the multifactor approach without any indication that the views of a hypothetical independent investor should be considered. (JA1514-1515.) Moreover, the Tax Court held that even if there were substantial

authority for the independent-investor test, taxpayer had not shown substantial authority for its claimed 2016 deduction because taxpayer "did not sufficiently establish (particularly through its expert witnesses) that an independent investor would have found as reasonable the $5 million paid to Mr. Hood in 2016."  (JA1515 & n.32.)

## SUMMARY OF ARGUMENT

Taxpayer is a corporation owned 100% by its founder, Clary Hood, and his spouse.  During each of the two years in issue taxpayer paid more than $5,000,000 in compensation to Mr. Hood and deducted the payments from its taxable income as compensation.

I.R.C. § 162 allows a deduction for ordinary and necessary business expenses, including "a reasonable allowance for salaries or other compensation for personal services actually rendered."  The test for deductibility is whether the payments are "reasonable and are in fact payments purely for services."  Treas. Reg. § 1.162-7(a).  Taxpayer here did not establish that the payments were reasonable.  The Tax Court therefore correctly determined tax deficiencies based on its finding of the amounts that were reasonable as compensation.

The Tax Court found that the record supported reasonable compensation to Mr. Hood of $3,681,269 in 2015, including deferred compensation for some services for 2000-2014, and $1,362,831 in 2016. As a sole shareholder, Mr. Hood was entitled to all the corporation's profits as dividends, but a corporation may not deduct its distribution of profits as a business expense.

The Tax Court relied on factors commonly considered by courts facing this frequently-litigated issue, including what comparable construction firms pay for comparable employees, taxpayer's dividend history, and the method and timing in which taxpayer determined Mr. Hood's bonuses. The evidence showed that the Commissioner's expert, David Fuller, analyzed what comparable businesses paid their comparable executives for each year from 2000-2016, permitting the Tax Court to determine both the reasonable amount of compensation that taxpayer could pay for the two years at issue and also the extent to which Mr. Hood was undercompensated for the years 2000-2014. The latter figure allowed the Tax Court to determine how much of the 2015 payments could be allowed as compensation for prior years.

The Tax Court also relied on the fact that taxpayer had not issued a dividend to shareholders during the entirety of the period 2000-2016. Although taxpayer adequately explained why it did not pay dividends during some years when cash needs were high and revenues low, taxpayer had no explanation for its failure to pay dividends during its most successful years when it had ample profits to distribute to shareholders but, instead, awarded its sole shareholder large bonuses. And taxpayer had no structured method for determining compensation for Mr. Hood or any other employee. Instead, taxpayer's board of directors, consisting of only Mr. and Mrs. Hood, determined bonuses near the end of taxpayer's fiscal year, when taxpayer could predict its annual profits and taxable income. That method of compensating an employee who is also a sole shareholder is more consistent with a distribution of profits than an intent to compensate for personal services actually rendered.

This Court should adhere to the multifactor test applied by the Tax Court here and the overwhelming majority of courts rather than reject it in favor of the Seventh Circuit's "independent investor" test. The independent-investor test conflicts with Treasury Regulations that

provide that deductible compensation may not exceed "what is reasonable under all the circumstances," and that reasonable compensation generally is "only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Treas. Reg. § 1.167-7(b)(3). The independent-investor test is also not likely to be an improvement over the multifactor approach in simplicity or predictability because it requires the trier of fact to determine the rate of return that would be "expected" by a hypothetical inactive outside investor, which would likely require expert testimony that accounts for everything that might go into forming such an investor's expectations.

The Tax Court also sustained a "substantial understatement" penalty for 2016. The Tax Court correctly found that taxpayer had failed to establish either of two defenses to the penalty. Taxpayer failed to establish the defense under I.R.C. § 6662(d)(2)(B)(i) for a taxpayer that shows that there is "substantial authority" for its return position. Taxpayer claimed that its position was supported by the Seventh Circuit's "independent investor" test. The Seventh Circuit's approach is not a substantial authority in relation to contrary authorities because

no other appellate court has followed it, and most other appellate courts, including this one, have endorsed a multifactor approach. Moreover, taxpayer failed to establish that a hypothetical independent investor would have found reasonable the amount of compensation taxpayer paid to Mr. Hood.

Taxpayer also failed to establish the defense under I.R.C. § 6664(c)(1) for a taxpayer that can show a reasonable cause for the understatement and that it acted in good faith. The Tax Court found that taxpayer established such a defense for 2015, but that it provided "almost no evidence" that it sought and obtained competent advice with respect to its treatment of the compensation paid to Mr. Hood in 2016. Taxpayer could not have simply followed the same advice it got for 2015, because that advice was that it was reasonable for taxpayer to remedy its undercompensation of Mr. Hood from 2000-2014 with a big bonus in 2015. Any advice it received for 2016 had to address the fact that the 2015 bonus had already remedied the prior undercompensation. Taxpayer did not show that that it received such advice.

# ARGUMENT

## I

**The Tax Court correctly determined the amounts of taxpayer's payments to Mr. Hood that were deductible under I.R.C. § 162 as reasonable compensation for services rendered**

### Standard of review

The Tax Court's selection of the factors or appropriate test for determining the reasonableness of compensation is reviewed de novo. Its finding of the amount of compensation that is reasonable, derived from application of the appropriate factors, is reviewed for clear error. *City Chevrolet Co. v. Commissioner*, 228 F.2d 894, 894 (4th Cir. 1956); *Miles-Conley Co. v. Commissioner*, 173 F.2d 958, 960 (4th Cir. 1949).

### A.    I.R.C. § 162(a)(1) limits a corporation's deduction for compensation to an amount that is "reasonable" and for "personal services actually rendered"

Corporations must pay federal income tax on their taxable income. I.R.C. §§ 11(a), 63(a).  To determine its taxable income, a corporation may deduct from its gross income its ordinary and necessary expenses, including salaries and other compensation.  I.R.C. § 162(a)(1).  But a corporation is not allowed a deduction for dividends paid to shareholders.  Treas. Reg. § 1.162-7(b)(1); *Aspro, Inc. v. Commissioner*,

32 F.4th 673, 678 (8th Cir. 2022); *United States v. Smith*, 418 F.2d 589, 596 (5th Cir. 1969) ("a dividend is not a deductible expense of a corporate taxpayer").  Dividends are not an expense of a business but are a distribution of corporate profits to shareholders after the corporation has paid its income tax.  *See* I.R.C. §§ 311(a), 316(a).  The disparate treatment of "compensation" and "dividends" creates an incentive in closely-held corporations, where the leading shareholders are often also the corporate managers, to recharacterize the distribution of profits to shareholders as compensation paid to managers.  By deducting the payments and reducing the corporate income taxes, more of the profits accrue to the shareholders.  *Haffner's Serv. Stations, Inc. v. Commissioner*, 326 F.3d 1, 3 (1st Cir. 2003);  *Mulcahy, Pauritsch, Salvador & Co. v. Commissioner*, 680 F.3d 867, 870 (7th Cir. 2012); *Elliotts, Inc. v. Commissioner*, 716 F.2d 1241, 1243 (9th Cir. 1983).

Section 162 prevents corporations from treating a distribution of profits to shareholders as deductible compensation by limiting deductions for business expenses to those that are "ordinary and necessary" in carrying on a trade or business, including "a reasonable allowance for salaries or other compensation for personal services

actually rendered." I.R.C. § 162(a)(1). Thus, to qualify as a deduction, a compensation expense must be both "reasonable" in amount and "for personal services actually rendered." *Id*. Applicable regulations confirm the test under § 162(a)(1) is two-pronged: "The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." Treas. Reg. § 1.162-7(a); *see also* § 1.162-7(b)(1) ("Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible."). The inquiry into reasonableness is broad and generally subsumes the inquiry into whether the payment was purely for services, although there are rare cases in which there is evidence that an otherwise reasonable compensation payment contains a disguised dividend. *Aspro*, 32 F.4th at 678.

Read literally, the statute gives the Commissioner the power to limit any business salary, whether the payee is a shareholder or not. But the Commissioner rarely challenges the deduction of compensation paid to a nonshareholder who is unrelated to a shareholder. One commenter states that "[v]irtually all challenges by the IRS to the deductibility of compensation have occurred in the context of salary

arrangements between related parties, involving either dealings

between corporations and shareholders or relatives of shareholders, or

dealings between partners or proprietors and their relatives." Anne E.

Moran, *Reasonable Compensation*, 390 Tax Mgmt. Portfolio (Bloomberg

BNA) (6th Ed. 2021) at III.B.4.

The limitations thus prevent corporations from disguising a

distribution of profits as deductible compensation. *Exacto Spring Corp.

v. Commissioner*, 196 F.3d 833, 835 (7th Cir. 1999) ("the primary

purpose of section 162(a)(1) . . . is to prevent dividends (or in some cases

gifts), which are not deductible from corporate income, from being

disguised as salary, which is"). The Supreme Court has stated,

> [E]xtraordinary, unusual and extravagant amounts paid by
> a corporation to its officers in the guise and form of
> compensation for their services, but having no substantial
> relation to the measure of their services and being utterly
> disproportioned to their value, are not in reality payment for
> services, and cannot be regarded as 'ordinary and necessary
> expenses' within the meaning of [§ 162(a)(1)'s predecessor].

*Botany Worsted Mills v. United States*, 278 U.S. 282, 292 (1929). The

compensation paid by a corporation to an employee who is also one of

the sole owners, as here, "is always subject to close scrutiny in order

that what is really a distribution of profits may not be passed off as payment of compensation." *Miles-Conley*, 173 F.2d at 960.

A corporation may compensate an employee for past services and deduct the compensation in the year such compensation is paid. *Lucas v. Ox Fibre Brush Co.*, 281 U.S. 115, 119 (1930). The taxpayer must establish the amount of the unremedied undercompensation, and that the current payments were intended as compensation for past services. *B & D Foundations, Inc. v. Commissioner*, 2001 WL 1168133 at *17, 82 T.C.M. (CCH) 692 (T.C. 2001); *Est. of Wallace v. Commissioner*, 95 T.C. 525, 553-54 (1990), *aff'd*, 965 F.2d 1038 (11th Cir. 1992).

A taxpayer challenging the Commissioner's disallowance of a deduction claimed under I.R.C. § 162(a)(1) bears the burden of proving that the expense was ordinary and necessary and that its payment of the expense was reasonable. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Botany Worsted Mills*, 278 U.S. at 289-90; *Miles-Conley*, 173 F.2d at 960; Tax Ct. Rule 142(a).

The compensation generally may not exceed what is "reasonable under all the circumstances." Treas. Reg. § 1.162-7(b)(3). The question of what constitutes reasonable compensation to a specific employee is "a

question of fact, to be determined by the peculiar facts and circumstances in each particular case." *Miller Mfg. Co. v. Commissioner*, 149 F.2d 421, 423 (4th Cir. 1945). *Accord*, *Martens v. Commissioner*, 1991 WL 87160 at *8, 934 F.2d 319 (4th Cir. 1991) (table).

**B.  Taxpayer failed to establish that the amounts it paid Mr. Hood in excess of the amounts allowed by the Tax Court were reasonable compensation for services rather than distributions of profits**

**1.  The Tax Court correctly considered all the relevant facts and circumstances as required by regulation and decades of caselaw**

Courts have examined a wide variety of circumstances in considering the frequently litigated reasonable-compensation issue, and some courts have assembled lists of pertinent factors. *See Eberl's Claim Serv., Inc. v. Commissioner*, 249 F.3d 994, 999 (10th Cir. 2001) . This Court has endorsed the Tax Court's use of one widely cited list of factors, albeit by unpublished opinion. *Richlands Med. Ass'n v. Commissioner*, 1992 WL 14603 at *2, 953 F.2d 639 (4th Cir. 1992) (table). *See Barton-Gillet Co. v. Commissioner*, 29 T.C.M. (CCH) 679 (T.C. 1970) (citing *Mayson* factors), 1970 WL 1706, *aff'd*, 442 F.2d 1343 (4th Cir. 1971). That list includes:

(1)  the employee's qualifications;

(2)  the nature, extent and scope of the employee's work;

(3)  the size and complexities of the business;

(4)  a comparison of salaries paid with the gross income and the net income;

(5)  the prevailing general economic conditions;

(6)  comparison of salaries with distributions to stockholders;

(7)  the prevailing rates of compensation for comparable positions in comparable concerns;

(8)  the salary policy of the taxpayer as to all employees.

*Mayson Mfg. Co. v. Commissioner*, 178 F.2d 115, 119 (6th Cir. 1949).

Two other factors applicable to this case include (9) the amount of compensation paid to the particular employee in previous years, and (10) whether an employee has personally guaranteed debts or other obligations of the corporation.  *Id*;  *Owensby & Kritikos, Inc. v. Commissioner*, 819 F.2d 1315, 1325 n.33 (5th Cir. 1987).  No one factor is dispositive, and the trial court must consider and weigh the totality of the facts and circumstances when making its decision.  *Owensby*, 819 F.2d at 1323.

After applying the foregoing factors, the Tax Court correctly found that taxpayer had failed to adequately establish that the entire amount paid to Mr. Hood was both reasonable and paid solely as compensation for his services. (JA1503-1504.)

### (1) Mr. Hood's background and qualifications

The Tax Court stated that an employee's superior qualifications may justify high compensation, and found that Mr. Hood had "substantial knowledge and experience in both managing and performing land-grading and excavation work," and had developed an "excellent" reputation. (JA1477.) The court also agreed with taxpayer that Mr. Hood was "extraordinarily talented in his industry." (JA1494.)

### (2) Nature, extent, and scope of Mr. Hood's work

The Tax Court credited Mr. Hood with being taxpayer's "key employee and driving force from its inception" and with his personal services being essential to taxpayer's success. (JA1477.) It also credited him for an important decision to transition taxpayer's business away from Walmart projects to the commercial and industrial sectors. (JA1478.)

Taxpayer's assertion that "it was stipulated by the parties. . . that Mr. Hood was both a dedicated leader of vision and that his efforts led to the financial boom to CHI" (Br. 17) is wrong. The parties stipulated that Mr. Hood worked long hours (JA161-162), but not that he was "a leader of vision," or that his efforts led to a "financial boom" for taxpayer, or anything similar.

### (3) Size and complexity of taxpayer's business

Executive compensation is generally positively correlated with revenue size. (JA1956.) The parties stipulated to taxpayer's size in each year of the review period as measured by gross receipts, gross income, and net income before and after taxes. (JA176-177.) The Tax Court found that taxpayer's excavation and grading business was more complex than general construction work. (JA1478.)

### (4) Comparison of taxpayer's income to Mr. Hood's compensation

Payment to a shareholder in the form of compensation that leaves the company with little taxable income is an indication that the payment is a disguised distribution of profits. *Aspro*, 32 F.4th at 679; *Alpha Med., Inc. v. Commissioner*, 172 F.3d 942, 948 (6th Cir. 1999). The Tax Court found that taxpayer paid Mr. Hood approximately 42%

and 26% of its pretax income in 2015 and 2016, respectively. It found that the amounts "are not insignificant," but it did not "find them telling of an egregious pattern of disguised dividends as traditionally understood under this factor," when considering that a portion of the payments were meant to compensate Mr. Hood for prior years of service. (JA1480.)

### (5) Economic environment

This factor looks to trends in the economic environment that could show whether a company's success is due to its executives' skill or exogenous factors. Here, the national economy generally expanded throughout the review period, as reflected in a chart in Fuller's report. (JA1940.) But taxpayer's gross receipts increased faster. (JA176-177.) Fuller, although recognizing the improving economic trends, placed taxpayer's performance in the upper quartile of industry peers for the years 2013-2016. (JA1946.) The Tax Court cited testimony of Fuller, Mr. Hood, and Jeff Greenway (taxpayer's outside accountant), as evidence that taxpayer's increase in revenues "cannot be credited to economic conditions alone," and that it was appropriate to recognize Mr. Hood's contributions to taxpayer's success. (JA1481-1482.)

We note that taxpayer's brief embellishes the Tax Court's favorable findings. Although the court found that taxpayer's improving fortunes "cannot be credited to economic conditions alone," it did not find that improving economic conditions played no role. (JA1481-1482.) Taxpayer thus misstates the findings in asserting that its "dramatic success was found to result not from prevailing economic conditions, but from Mr. Hood's highly effective efforts to grow the company" (Br. 5), and that its "trajectory of success was found by the court below to be his achievement alone, and not because of general economic conditions." (Br. 14.)

### (6)    Comparison of Mr. Hood's compensation with distributions to stockholders

A court may consider a profitable corporation's unexplained failure to distribute dividends in determining the reasonableness of compensation paid to its owner/employees. *Miles-Conley*, 173 F.2d at 960; *Richlands Med. Ass'n v. Commissioner*, 60 T.C.M. (CCH) 1572 (T.C. 1990), *aff'd*, 953 F.2d 639 (4th Cir. 1992).

Taxpayer failed to pay any cash dividends to its shareholders during the entire 17-year review period, including its most profitable years of 2013-2016, when its net income after taxes ranged from $4.8

million to $9.5 million.  (JA154; JA176-177.)  During these same highly profitable years taxpayer dramatically increased Mr. Hood's compensation from $221,100 in 2012, to $1,381,707 in 2013, $1,681,538 in 2014, $5,168,559 in 2015 and $5,196,500 in 2016.  (JA1954.) Taxpayer's failure to pay any dividends, particularly when "substantial sums were available for distribution," *Miles-Conley*, 173 F.2d at 960, weighs against the reasonableness of its bonus payments to Mr. Hood in 2015 and 2016.

The Tax Court found that taxpayer advanced persuasive reasons for not declaring dividends for some years, such as 2010, when business was slow and capital needs were high.  (JA1483; *see* JA347.)  Those reasons were no longer persuasive in 2015 and 2016 in view of Mr. Hood's decision to forgo dividends for 16 years, and his further decision to distribute the retained earnings as a bonus payment to himself rather than as dividends.  (JA1483-1484.)  The Tax Court noted that between 2010 and 2016 taxpayer's year-end stockholder equity increased nearly six times (from $5.5 million to $31.2 million), and its cash balance increased nearly fifteen times (from $1.3 million to $15.4 million).  (JA1484 n.17; *see* JA1970.)

Mr. Hood's trial testimony was also revealing. Asked why he agreed to take out such significant sums of money in 2015-2016, when he had previously wanted to keep money in the business, he testified that he

> knew that getting money out of a corporation with income tax and stuff like that, I needed to start making some preparations to do that. And with health matters, I knew I needed to prepare for a changing of the guard.

(JA595.) Mr. Hood's testimony that the large bonus payments were "getting money out of a corporation" indicates that the payments were not compensation for services, but distributions of profit to a sole shareholder before transferring the business to new owners.

### (7) Compensation for comparable positions in comparable concerns

1. This factor considers what comparable businesses are paying as compensation for comparable positions. *See* Treas. Reg. § 1.162-7(b)(3) (reasonable compensation generally is "only such amount as would ordinarily be paid for like services by like enterprises under like circumstances"). This factor "can be the most significant factor in determining reasonable compensation." *Rutter v. Commissioner*, 853 F.2d 1267, 1273 (5th Cir. 1988). *Accord*, *Alpha Med.*, 172 F.3d at 950;

*Charles Schneider & Co. v. Commissioner*, 500 F.2d 148, 154 (8th Cir. 1974). The Tax Court here considered this factor as one of the four it considered "most relevant and persuasive" in reaching its conclusion. (JA1503-1504.)

The evidence of what comparable concerns pay to fill comparable positions frequently includes expert testimony with survey data. *E.g., Aspro, Inc. v. Commissioner*, 121 T.C.M. (CCH) 1037 (T.C. 2021), *aff'd*, 32 F.4th 673 (8th Cir. 2022); *Rutter v. Commissioner*, 52 T.C.M. (CCH) 326 (T.C. 1986), *aff'd*, 853 F.2d 1267 (5th Cir. 1988); *cf. Alpha Med.*, 172 F.3d at 950 (expert opinion unpersuasive because expert could not locate comparable survey data for similar position).

The Commissioner relied on the report of David Fuller (JA1933-2003), whom the Tax Court qualified as an expert in financial valuation and executive compensation (JA1214). Since taxpayer maintained that part of the compensation it paid Mr. Hood during the years at issue represented compensation due for the years 2000-2014, Fuller addressed the extent of Mr. Hood's undercompensation during that period. (JA1953-1957.) Fuller first evaluated taxpayer's financial performance, and then Mr. Hood's role within the company in order to

identify comparable positions, before determining what comparable

concerns were paying for comparable employees.  (JA1940-1946;

JA1949-1950.)

2.     Fuller analyzed taxpayer's financial performance during the

review period including the generally expanding national economy over

the period, the cyclical nature of the construction industry, and regional

variations specific to North and South Carolina.  (JA1940-1942.)  He

reviewed taxpayer's income statements and balance sheets and

observed that cash balances as a percentage of assets were generally

above the 50th percentile of industry peers. (JA1942.)  He observed that

taxpayer's revenue and profit were volatile through 2011, and its gross

profits were "consistently below average compared to industry data"

until the year ending May 31, 2013.  (JA1943.)  Fuller confirmed

taxpayer's below-average performance through 2012 by comparing Risk

Management Association survey data with taxpayer's return on assets

and return on equity.  (JA1944-1945.)  He concluded that taxpayer "was

a lower quartile business in terms of financial metrics" from 2000

through 2011, and then 2012 through 2016 taxpayer "moved to the

median in terms of industry financial performance, then to the upper

quartile for the remainder of the Review Period" (JA1946).

    3.    With taxpayer's financial metrics established, Fuller

considered survey data to determine how much comparable businesses

paid employees in comparable positions during the review period.

(JA1949-1962.)  He observed that Mr. Hood had extensive duties

throughout the review period, worked 65 hours/week, and had 50 years

grading experience, but no college degree or formal business training.

(JA1949.)

    Fuller reviewed industry compensation data from multiple sources

and selected PAS, Inc., as the best source for comparisons because of its

industry-specific data, recognition of appropriate company size, the

availability of long-term data that could be used consistently

throughout the 17-year review period, and because a PAS report was

specifically designated for compensation of employees who are also

shareholders.  (JA1954.)  He accounted for Mr. Hood's central role in

taxpayer's operations by using the most highly compensated position

reported by PAS, that of "Board Chairman."  (JA1955.)

Fuller used the "average" PAS Board Chairman compensation for years 2000-2011 due to taxpayer's poor operating performance. (JA1956.) For 2012 he again used the "average" compensation for a board chairman, but for the next higher company revenue level in the PAS data to account for the fact that taxpayer had a significant backlog of revenue remaining ($15.3 million with expected 21.8% profit margin). (JA1956, JA1974.) For the years 2013-2016 Fuller applied the 99th percentile of PAS data for a board chairman because of taxpayer's superior performance. (JA1956.) He thus used an appropriate compensation level for each year of the review period to determine both the comparable compensation paid by comparable concerns for 2015 and 2016 and also the amount by which taxpayer undercompensated (or overcompensated) Mr. Hood for the years 2000-2014. Fuller concluded that Mr. Hood had been undercompensated by approximately $2.3 million through May 31, 2014. Since an owner's election to temporarily undercompensate himself is similar to making a loan to the business, Fuller added interest at prime rate in the amount of $75,307. (JA1957, JA1995-1996, JA1999.)

4.    As noted at p. 23, courts also consider the extent to which an employee has guaranteed the corporation's obligations.  Fuller therefore examined Mr. Hood's history of guaranteeing taxpayer's debts and surety bonds.  Taxpayer had never compensated the Hoods for personal guarantees before 2015 (JA189) but justified part of the 2015-2016 compensation as retroactive compensation for those guarantees.

Although Fuller agreed that it was not inappropriate to compensate Mr. Hood for personally guaranteeing taxpayer's debts, he concluded that Mr. Hood also borrowed funds from taxpayer and used taxpayer's credit to benefit himself and his other investments.  Accordingly, Fuller did not adjust Mr. Hood's compensation to account for the credit and credit guarantees he and taxpayer extended to each other.  (JA1951.)

Taxpayer was required to provide surety bonds for much of its work, and Mr. Hood often signed personal guarantees for these bonds.  (JA189.)  Fuller calculated an appropriate amount of compensation for bonding guarantees as $949,200 for the 17-year review period.  Fuller observed that taxpayer's calculation was higher by only about $157,000

for the same period, and he therefore adopted it ($1,106,200) for purposes of calculating Mr. Hood's compensation. (JA1953, JA1988.)

Fuller also testified, however, that surety bonds are common in the construction industry, and guarantees are often required of major stockholders. He concluded that compensation for personal guarantees of construction bonds would likely already be included in the industry data of compensation paid to board chairmen of construction firms. Fuller therefore testified that adding additional compensation for bonding guarantees risked double counting such compensation. (JA1952.) He thus produced two conclusions, one that included approximately $1,106,200 in compensation for personally guaranteeing surety bonds, and another that excluded this compensation on the basis it was likely already included in the compensation paid to board chairmen of industry peers.

The Tax Court had to resolve the matter of which of Fuller's conclusions was more appropriate given that there was no direct evidence showing whether the PAS survey data did or did not include compensation to board chairman for guaranteeing performance bonds. The court resolved this issue in taxpayer's favor, and selected Fuller's

"primary" conclusion that added the additional compensation for bond guarantees. (JA1504 n.29.)

5.     Fuller concluded that the amount of compensation paid to Mr. Hood that was reasonable for 2015 was $1,288,825 for his services during 2015, $2,317,137 as deferred compensation for services and for guaranteeing surety bonds for the years 2000-2014, plus $75,307 as interest on the deferred compensation, for a total of $3,681,269. The amount of compensation that was reasonable for 2016 was $1,362,831. (JA1937, JA1999.)

The Tax Court was free to accept or reject Fuller's expert testimony, in whole or in part, in the exercise of its sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 615 F.3d 321, 330 (5th Cir. 2010); *Richlands*, 1992 WL 14603, at *4. The Tax Court found that Fuller's report was "the most credible and complete source of data, analyses, and conclusions in the record regarding what similar companies might be willing to pay Mr. Hood." (JA1494.)

### (8) Taxpayer's salary policy as to all employees

Courts often compare the manner in which a corporation has compensated its employees who are shareholders with its compensation policy toward employees who are not shareholders. A consistent compensation policy across groups weighs in favor of the reasonableness of the taxpayer's compensation scheme. For example, the Tax Court has found high compensation paid to shareholder-employees reasonable where the taxpayer was a direct-sales marketer that used an established, well-defined commissions schedule for both shareholding and nonshareholding employees. *Home Interiors & Gifts, Inc. v. Commissioner*, 73 T.C. 1142, 1159 (1980). Even without a commissions schedule, a corporation's generosity toward all its employees suggests that high compensation to a shareholding employee is not special treatment for an owner. *E.g., Owensby*, 819 F.2d at 1330; *Eberl's Claim Serv., Inc. v. Commissioner*, T.C. Memo 1999-211, 1999 WL 429140 at *11, *aff'd*, 249 F.3d 994 (10th Cir. 2001). On the other hand, an unstructured system of determining compensation generally conflicts with an intent to compensate for personal services. *Aspro*, 32 F.4th at

679; *Nor-Cal Adjusters v. Commissioner*, 503 F.2d 359, 362 (9th Cir. 1974).

The circumstances here suggest that Mr. Hood was compensated differently from nonshareholding employees because he was the owner. Fuller considered the compensation paid to two key officers that were not owners and determined that Andy Painter's compensation was in the lower quartile for his job description, while Tom Addley's compensation was near the median based on his job description, notwithstanding taxpayer's superior performance in 2015 and 2016. (JA1959.) Mr. Hood's excessive compensation was therefore not part of a generous salary policy toward all its employees.

Taxpayer responds that the Tax Court erred in not considering some of the bonuses it paid. (Br. 11-12, 17.) But it cites only to (1) Phillips' testimony discussing two employees' increasing bonuses in 2012-2016 (Br. 11, citing JA339-343), and (2) some large bonuses paid in 2017 (Br. 11, 17, citing JA389-390). The testimony concerning *two* employees' bonuses is not probative of a generous salary policy toward *all* employees without more information about their total compensation and that of the other employees. Taxpayer had approximately 150

employees during 2016. (JA157.) Moreover, Phillips agreed that there were "plenty" of other employees that "didn't get much in the way of a bonus." (JA342.) And taxpayer's reliance on evidence of bonuses paid in 2017 is improper. At trial, taxpayer objected to the Commissioner's cross-examination of Mr. Hood about "anything past 2016" as irrelevant, and the Tax Court sustained the objection. (JA567 *see also* JA576.) Taxpayer should not now be heard to complain that the court did not consider the bonuses paid in 2017.

Moreover, taxpayer had no structured method in place for setting compensation for any employee. Mr. Hood's compensation was set by Mr. and Mrs. Hood in their roles as the board of directors, and Mr. Hood personally set the salary and bonus amounts of all the other employees based on nonspecific criteria such as their "work records" and "ability to get along with people." (JA596.)

Thus, Mr. Hood was plainly compensated differently than other officers because he was a shareholder. The manner in which taxpayer determined Mr. Hood's compensation resembled a decision to distribute profits to an owner. Mr. Hood's bonuses were decided in May, close to taxpayer's fiscal year end of May 31, and at a time when taxpayer could

anticipate its year-end profits and taxable income.  *See Owensby*, 819 F.2d at 1329 (substantial bonuses declared at year-end when earnings are known usually indicates distribution of profits);  *Rapco, Inc. v. Commissioner*, 85 F.3d 950, 955 (2d Cir. 1996) (compensation scheme that was "bonus-heavy and salary-light" suggested "masked dividends"). Mr. Hood's bonuses were not based on any personal performance metrics.

### (9) Mr. Hood's compensation in prior years

This factor has been cited in connection with the recognition that a corporation can compensate an employee for services rendered in a prior year.  *E.g., Alpha Med.*, 172 F.3d at 950.  But this factor also recognizes that an increase in compensation from prior years that coincides with an increase in profits, but not with an increase the employee's responsibilities or workload, particularly when paid to a sole shareholder, justifies an inference that the "sole stockholder was attempting to drain off the corporate profits in the guise of salary." *Miles-Conley*, 173 F.2d at 960.

Here, like the sole shareholder in *Miles-Conley*, Mr. Hood's

compensation increased with corporate profits without any

corresponding increase in his duties, responsibilities, or workload.

### (10) Mr. Hood's personal guaranty of taxpayer's debts and bonding obligations

An employee may be compensated for guaranteeing his employer's

debts or other obligations. *Owensby*, 819 F.2d at 1325 n.33. The Tax

Court found that Mr. Hood was entitled to additional compensation for

his guaranty of surety bonds, and accepted taxpayer's computation of

the appropriate amounts, which Fuller adopted for his report. (JA1502-

1503.) Taxpayer does not dispute Fuller's opinion (and the Tax Court's

finding) that Mr. Hood was not entitled to additional compensation for

his debt guarantees because he also used taxpayer's credit for his own

benefit. (JA1503; JA1951.)

_____

The Tax Court thus considered ten factors commonly considered

by other courts facing this issue, including factors previously applied by

this Court. It identified "the most relevant and persuasive factors" in

reaching its conclusion as those addressing comparable pay by

comparable concerns, taxpayer's shareholder distribution history, the

setting of Mr. Hood's compensation for the years at issue, and Mr. Hood's involvement in the business. (JA1503-1504.) The Tax Court found that taxpayer "has not adequately established how the amounts paid to Mr. Hood during the years at issue were both reasonable and paid solely as compensation for his services to petitioner during the review period." (JA1503.) The court "found Mr. Fuller's testimony most helpful" because he "considered the multifactor approach, included compensation for the surety bond guaranties, and offered a well-reasoned comparison of petitioner and Mr. Hood's salary against industry standards" (JA1504 (footnote omitted).) Accordingly, the court found that the amounts deductible as reasonable compensation were $3,681,269 for 2015 and $1,362,831 for 2016. (JA1504.) The Tax Court's findings have ample support in the record.

## 2. The Court should reject taxpayer's invitation to adopt the independent-investor test

In *Exacto Spring Corp. v. Commissioner*, 196 F.3d 833 (7th Cir. 1999), the Seventh Circuit rejected the widely used multifactor approach. It criticized multifactor tests as "nondirective," inviting trial courts to make arbitrary decisions based on unguided discretion. *Id*. at 835. It adopted a new test, referred to as the "independent investor"

test.  That test asks the factfinder to determine what rate of return would be expected by an independent, inactive, investor, and compare it to the corporation's actual rate of return.  If the actual return is "a far higher return than" the investor had any reason to expect, then the compensation paid to the corporation's CEO would be presumptively reasonable.  *Id*. at 839.  The presumption is rebuttable with evidence that the corporation's rate of return is due to factors other than the manager's skill.  The Seventh Circuit deemed its new test "much simpler and more purposive" than the multi-factor approach, "return[ing] the inquiry to basics" by focusing on the disinterested investor's perspective.  *Id*. at 838.

Although the Second and Ninth Circuits had earlier included an investor's perspective as one factor to consider or as a "lens" through which to view other factors (*Elliots, Inc. v. Commissioner*, 716 F.2d 1241, 1245 (9th Cir. 1983); *Dexsil Corp. v. Commissioner*, 147 F.3d 96, 101 (2d Cir. 1998)), only the Seventh Circuit has jettisoned the multi-factor approach entirely.  Since the *Exacto* opinion in 1999 no other appellate court has followed it in rejecting the multifactor approach. *See Eberl's Claim Serv., Inc. v. Commissioner*, 249 F.3d 994, 1003–04

(10th Cir. 2001) (rejecting *Exacto* because "[w]hatever the relative wisdom of the two approaches, absent en banc rehearing we are bound to the use of a multi-factor approach"); *Haffner's Serv. Stations,* 326 F.3d 4 (rejecting *Exacto* because "[t]here is always a balance to be struck between simplifying doctrine and accuracy of result, and for the present we think that multiple factors often may be relevant").

The Court should decline taxpayer's invitation (Br. 34-37) to abandon the multifactor approach and adopt the independent-investor test for the reasons described here.

1. Contrary to taxpayer's assertion (Br. 19), this Court has not "implicitly embraced" the independent-investor test by citing *Owensby*, 819 F.2d 1315. In *Owensby*, the Fifth Circuit recognized that the "so-called independent investor test is simply one of the factors a court should consider, and in certain cases it may be a substantial factor." *Id.* at 1327. But this Court in *Richlands Medical* cited *Owensby* only with respect to other propositions of law. 1992 WL 14603, at *1-*2. That does not constitute an "implicit embrace" of uncited propositions in *Owensby*.

2.     The independent-investor test's focus on a comparison of actual and expected rates of return to the exclusion of all other factors conflicts with applicable regulations, which provide that "[t]he test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services," where "reasonable" means "reasonable under *all* the circumstances."  Treas. Reg. § 1.162-7(a), (b)(3) (emphasis supplied).  The independent investor test conflicts with regulations because it avoids consideration of "all the circumstances" relevant to whether the compensation is reasonable, and also avoids consideration of whether the payments were made "purely for services."

3.     The test's "inputs" are each messier than in *Exacto*'s abstract model, creating a test that is not necessarily simpler than the multifactor approach.  The test looks primarily to whether the company's rate of return on the owner's investment exceeds the return that would be expected by a hypothetical independent investor.  196 F.3d at 838.  But it is not at all clear how a trial court should determine what an independent investor would expect, let alone how much greater the return must be to give rise to a presumption that the compensation

is reasonable. In *Exacto* the Commissioner's expert witness testified that a reasonable investor would require a thirteen percent return on investment, and the Seventh Circuit accepted this figure as a concession by the government. *Id*. at 837. But when parties commence litigation with the understanding that a hypothetical investor's "expected rate of return" may be outcome-determinative, it is likely to become the subject of conflicting and partisan expert testimony. And what factors will guide the trial court in determining an expected rate of return? Presumably, an independent investor would consider everything relevant to the taxpayer and its operational environment affecting its potential risks and rewards.

Measuring the corporation's actual rate of return is also likely to prove controversial because there are multiple ways to measure such returns. The corporations involved in these cases are normally closely-held businesses that are not publicly traded, so return cannot be measured by an increase in the market price of stock. Rate of return is itself a ratio of the corporation's income divided by its equity, where both numerator and denominator are subject to dispute and therefore also subject to expert testimony as to arcane aspects of accounting. For

example, what period or periods must be analyzed in relation to the compensation at issue? Will it be just the period(s) of allegedly excess compensation, or the period(s) in which a corporation made the decision to pay the compensation, or the employee's entire tenure? Which of the many definitions of income and equity yield the most appropriate measurement? *See* Stetson, *Courts Don't Follow: Reasonable Compensation Rulings and the Exacto Spring Approach*, 15 Chap. L. Rev. 343, 367-70 (2011) (describing nine issues that commonly arise when determining return on equity); *B & D Foundations, Inc.*, 2001 WL 1168133 at *20-21 (noting decisions that have used equity at beginning of year, end of year, average for year, or cumulative equity).

4. Even after determining expected and actual returns, sufficient evidence can rebut the independent-investor test's presumption of reasonableness by showing that: (i) the return on investment is due to extraneous factors; (ii) the "employee" is really just an inactive shareholder; or (iii) the employee's compensation is out of line with that of comparable, non-owner employees in his company or at similar companies. *Mulcahy*, 680 F.3d at 871; *Menard, Inc. v. Commissioner*, 560 F.3d 620, 623 (7th Cir. 2009); *Exacto*, 196 F.3d at

835, 839. In such cases "other factors . . . have to be considered, in particular comparable salaries." *Mulcahy*, 680 F.3d at 871. Indeed, even the *Exacto* opinion did not rely solely on return on equity in reaching its decision. It also relied on the fact that the chief executive's salary had been approved by two non-employee shareholders who owned 40% of the corporation, and who were not related to the chief executive, and the fact that all of the traditional reasonable-compensation factors were either neutral or favored the taxpayer, 196 F.3d at 837, which is not the case here.

5. At all events, as the Tax Court recognized (JA1487 & n.18; JA1515 n.32), taxpayer did not show that an independent investor would have found as reasonable the compensation paid to Mr. Hood in 2015 and 2016. Taxpayer attempted to show that the independent-investor test was met through the testimony of Samuel Kursh, one of its two experts, and through the report of Kursh's firm, BLDS. But Kursh's testimony and the BLDS report suffered from numerous serious defects. The court found that Kursh's knowledge of the report's content was "materially lacking." (JA1486.) The report itself lacked necessary supporting calculations, did not include all underlying data, and "rested

on numerous dubious assumptions." (JA1486.) It "crudely compared" taxpayer, a private regional specialty construction firm, to dissimilar public companies with little attempt at adjusting for the obvious and stark differences between the two types of companies, and it also compared taxpayer's book-value return on equity to public companies' market returns without accounting for cash dividends and without credibly establishing a correlation between these separate performance measures. (JA1486-1487.) The Tax Court accordingly gave Kursh's testimony "little to no weight" (JA1487) and stated that even if it placed greater emphasis on the independent-investor test it had "serious doubts as to whether the test was properly applied in the BLDS report" (JA1487 n.18). The court correctly found that taxpayer "did not sufficiently establish (particularly through its expert witnesses) that an independent investor would have found as reasonable the $5 million paid to Mr. Hood in 2016." (JA1515 n.32.)

### 3. Taxpayer's arguments lack merit

Taxpayer's principal argument is essentially a critique of the weight the Tax Court ascribed to the various factors. (Br. 10-27.) Taxpayer fails to show any error in the Tax Court's analysis.

a.     Taxpayer contends that the Tax Court erred when it "put all (100%) of the weight" on Fuller's analysis of compensation paid to comparable executives at comparable concerns.  (Br. 17; *see* Br. 14, 23.) Taxpayer's characterization of the court's analysis is inaccurate. The court also considered nine other factors (JA1477-1484; JA1495-1503) and stated that three of those other factors were among the most relevant and persuasive factors in reaching its conclusions.  (JA1503-1504.)

b.     Taxpayer asserts that the Tax Court should not have used the survey data at all.  It claims that consideration of prevailing rates of compensation for comparable positions at comparable concerns, which it refers to as "industry norms," is irrelevant if the employee's performance is "extraordinary," other employees have been "fairly compensated," and the corporation's shareholders have been "allocated a fair share" of corporate profits.  (Br. 12, 22.)  Taxpayer also impugns Fuller's "statistical integrity," and the survey data's "statistical sampling shortcomings." (Br. 16.)  The Tax Court rejected taxpayer's argument that Fuller's report was "statistically invalid."  (JA1493-1494.)  His argument regarding purported deficiencies in the survey

data is entirely perfunctory and undeveloped, and therefore waived. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021).

Taxpayer's supposed rule that "industry norms" should be set aside under certain circumstances (Br. 12) lacks support. Taxpayer purports to derive this rule from *Home Interiors & Gifts, Inc. v. Commissioner*, 73 T.C. 1142 (1980), and three subsequent Tax Court cases. (Br. 12-13.) But those cases state no such rule. Moreover, no such rule can be derived because the courts have consistently held that the trial court must consider and weigh the totality of the facts and circumstances when making its decision. *Owensby*, 819 F.2d at 1323 (collecting cases). As this Court once colorfully underscored the nature of the task, "[t]hese facts and circumstances vary so widely that each corporate tub must more or less stand upon its own bottom." *Miller Mfg.*, 149 F.2d at 423. It is therefore improper to attempt to derive a rule that one factor (prevailing rates for comparable positions) should be set aside in the presence of certain other factors.

In any event, the case on which taxpayer places its principal reliance, *Home Interiors,* is distinguishable on important grounds. The

taxpayer there was a direct-sales organization, engaged in the sale of home decorations through use of the "hostess plan," by which products were sold only in the homes of cooperating hostesses. 73 T.C. at 1143. The company had a substantial history of paying dividends. *Id*. at 1148. The executives and "all key employees" were compensated primarily on the basis of a well-defined commissions schedule. *Id*. at 1150, 1159-60. The corporation's top executives together owned only slightly more than 50% of the stock, and the board of directors included the four top executives and five persons not related to any of them. *Id*. at 1150. Since the unrelated shareholders held a substantial block of stock, the executive officers were not "free to do as they wished in running the affairs of the company." *Id*. at 1160. And although the top executives were highly paid, "other key employees" (such as area and branch managers) were also highly paid and their compensation increased at approximately the same rate as the compensation of the top executives. *Id*. at 1159. After considering the foregoing facts, the Tax Court set aside expert testimony of what executives were being paid at comparable sales organizations as "not dispositive of the issue in this case." *Id*. at 1162.

None of those facts are present here. Taxpayer had no history of paying dividends; Mr. Hood and his wife owned 100% of the stock and were free to do as they wished in running the affairs of the company, including setting Mr. Hood's compensation; and taxpayer did not compensate two other key employees (Painter and Addley) in the same fashion as it compensated Mr. Hood. (JA1959.)

c.      Taxpayer states one of the issues for this appeal is whether the Tax Court erred "in concluding that the rationale for the bonuses in question was to pay disguised dividends." (Br. 27.) Taxpayer further asserts that the record "contradicts the court's suggestion" that the bonuses were approved because of Mr. Hood's "desire to conceal dividends." (Br. 28.) Taxpayer's argument is misguided. Taxpayer does not identify where in the opinion it finds the Tax Court's erroneous conclusion or suggestion, and the court made no express finding that there was  a desire to conceal dividends. In any event, the Tax Court was not required to find an intent to conceal or disguise dividends. It was only required to determine whether taxpayer established that the compensation it paid Mr. Hood was an ordinary and necessary expense of its business. It did not need to find  any species of intent on the part

of taxpayer or Mr. Hood in order to determine that the compensation was excessive and therefore not deductible. *Cf. Biltmore Homes, Inc. v. Commissioner*, 288 F.2d 336, 340 (4th Cir. 1961) ("[t]o constitute a distribution taxable as a dividend, the benefit received by the shareholder need not be considered as a dividend either by the corporation or its shareholders") (cleaned up); *Crosby v. United States*, 496 F.2d 1384, 1388 (5th Cir. 1974) ("a taxpayer can be charged with disguised or constructive dividend income even though . . . neither the corporation nor the shareholder intended a dividend"); *Roberts v. Commissioner*, 981 F.2d 1251 (4th Cir. 1992) (table) (citing *Crosby*).

Treasury Regulations also refute taxpayer's suggestion that the Tax Court was required to find an intent to disguise dividends. Disallowed compensation deductions are not necessarily treated as a dividend payment to the recipient. Rather, the income tax liability of the recipient depends on the circumstances of each case. Treas. Reg. § 1.162-8; *Alexander Shokai, Inc. v. Commissioner*, 63 T.C.M. (CCH) 1870 (T.C. 1992), *aff'd*, 34 F.3d 1480 (9th Cir. 1994) ("If such payments do not represent amounts paid as compensation for services rendered, they must be treated as what they actually are.").

## II.

**The Tax Court correctly upheld the substantial-understatement penalty imposed by the Commissioner for 2016**

### Standard of review

This Court reviews whether a taxpayer's treatment of an item is supported by substantial authority for clear error. *Antonides v. Commissioner*, 893 F.2d 656, 660 (4th Cir. 1990). *Contra Est. of Kluener v. Commissioner*, 154 F.3d 630, 637 (6th Cir. 1998) (reviewing this issue de novo); *Chemtech Royalty Assocs., L.P. v. United States*, 823 F.3d 282, 287 (5th Cir. 2016) (same where facts are undisputed).

Whether a taxpayer can avoid a tax penalty because of a reasonable cause and its good faith is a question of fact reviewed for clear error. *Est. of Kechijian v. Commissioner*, 962 F.3d 800, 810 (4th Cir. 2020).

### A. Applicability of the substantial-understatement penalty

Under I.R.C. § 6662, a 20% penalty is imposed on any portion of a tax underpayment due to a substantial understatement of income tax. I.R.C. § 6662(a), (b)(2). In general, an understatement is substantial if it exceeds ten percent of the tax required to be shown on the return.

I.R.C. § 6662(d)(1)(B)(i).  Taxpayer does not dispute that its 2016

understatement, as redetermined by the Tax Court, exceeded ten

percent of the tax required to be shown.

A taxpayer can avoid the penalty under I.R.C. § 6662 for any item

to the extent it had "substantial authority" for its treatment of the item.

I.R.C. § 6662(d)(2)(B).  Alternatively, it can avoid the penalty if it shows

it had a reasonable cause for its underpayment and acted in good faith

with respect to such underpayment.  I.R.C. § 6664(c).

As an alternative to showing "substantial authority," a taxpayer

can avoid a penalty by showing adequate disclosure and "a reasonable

basis" for its tax treatment of the item.  I.R.C. § 6662(d)(2)(B)(ii).  The

"reasonable basis" standard is  less stringent than the "substantial

authority" standard.  Treas. Reg. § 1.6662-3(b)(3).  The Tax Court,

however, did not regard taxpayer as arguing for a "reasonable basis"

defense (*see* JA1511-1513), and on appeal taxpayer argues only for the

"substantial authority" defense of I.R.C. § 6662(d)(2)(B)(i) and the

"reasonable cause and good faith" defense of I.R.C. § 6664(c)(1).  (Br. 32-

34.)[1]  The Tax Court correctly found that taxpayer failed to establish

either of these defenses with respect to the 2016 penalty.  (JA1511-

1515.)

### B.  Taxpayer has not established any applicable defense to the penalty

#### 1.  Taxpayer has not established substantial authority for its deduction of excessive compensation

The amount of the understatement subject to the penalty is

reduced by the portion which is attributable to "the tax treatment of

---

[1] Taxpayer also suggests that the penalty here violates IRS guidance that the penalty is inapplicable in reasonable-compensation cases if the taxpayer properly disclosed relevant facts on its returns. (Br. 36, citing Rev. Proc. 92-23, 1992-1 C.B. 737.)  Taxpayer relies on out-of-date authority that does not apply here because Rev. Proc. 92-23 interpreted a prior version of I.R.C. § 6662.  As originally enacted in 1989, the penalty did not apply to the portion of the understatement attributable to any item for which the taxpayer had adequately disclosed relevant facts in its return.  Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, § 7721(a), 103 Stat. 2395 (adding I.R.C. § 6662(d)(2)(B)(ii)).  Congress modified the penalty in 1993 to add to the existing disclosure requirement that "(II) there is a reasonable basis for the tax treatment of such item by the taxpayer."  Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, § 13251(a), 107 Stat. 312 (amending I.R.C. § 6662(d)(2)(B)(ii)).  *See* Treas. Reg. § 1.6662-7(c) (substantial-understatement penalty "may be avoided by adequate disclosure of a return position only if the position has at least a reasonable basis").  Therefore, Rev. Proc. 92-23 does not apply to the version of I.R.C. § 6662 that governs the penalties here.

any item by the taxpayer if there is or was substantial authority for such treatment." I.R.C. § 6662(d)(2)(B)(i). The "substantial authority" standard is "an objective standard involving an analysis of the law and application of the law to relevant facts." Treas. Reg. § 1.6662-4(d)(2). The "substantial authority" standard is less stringent than the more-likely-than-not standard but is more stringent than the "reasonable basis" standard described in Treas. Reg. § 1.6662-3(b)(3). *See* Treas. Reg. § 1.6662-4(d)(2).

Substantial authority exists "only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. All authorities relevant to the tax treatment of an item, including the authorities contrary to the treatment, are taken into account in determining whether substantial authority exists." Treas. Reg. § 1.6662-4(d)(3)(i); *see also Kluener*, 154 F.3d at 639 ("substantial" means more than a reasonable basis, requiring a taxpayer to "present considerable or ample authority"). The weight accorded an authority "depends on its relevance and persuasiveness, and the type of document providing the authority." Treas. Reg. § 1.6662-4(d)(3)(ii).

Taxpayer did not show substantial authority for its deduction of the excessive payments to Mr. Hood. The authorities it relies upon, *Exacto* and its progeny, merely establish alternative criteria for testing whether payments to a shareholder are "ordinary and necessary" expenses of the business for personal services rendered. But by 2015 the *Exacto* test did not represent authority that was substantial in relation to weight of authorities applying multifactor tests. The First, Second, Third, Fifth, Sixth, Eighth, Ninth and Tenth Circuits have applied multifactor tests in published opinions, and this Court has endorsed the Tax Court's use of multifactor tests in an unpublished opinion. *Dexsil Corp.*, 147 F.3d 100 (five factors); *Charles Schneider*, 500 F.2d at 151-52; *Eberl's Claim Serv.*, 249 F.3d at 999 (collecting cases); *B.B. Rider Corp. v. Commissioner*, 725 F.2d 945, 952 (3d Cir. 1984); *Richlands*, 1992 WL 14603 at *2. The most recent court of appeals to reject the Seventh Circuit's approach explained its reasoning in terms that apply to this case:

> There is always a balance to be struck between simplifying doctrine and accuracy of result, and for the present we think that multiple factors often may be relevant. *Exacto* remains a useful reminder that reasonableness under section 162(a)(1) is not a moral concern or a matter of fairness; the inquiry aims at what an arm's-length owner would pay an

> employee for his work. The problem is that the actual payment—ordinarily a good expression of market value in a competitive economy—does not decisively answer this question where the employee controls the company and can benefit by re-labeling as compensation what would otherwise accrue to him as dividends.

*Haffner's Serv. Stations*, 326 F.3d at 4. The Tax Court correctly concluded that, in light of these numerous contrary authorities, *Exacto* did not constitute "substantial authority." (JA1514-1515.)

Moreover, in order to establish the existence of "substantial authority" by means of an alternative test, taxpayer must show that application of the test to the facts here would reduce or eliminate the understatement. Taxpayer failed to do so. As discussed at pp. 48-49, *supra*, taxpayer attempted to show that the independent-investor test was met through expert testimony and an expert report, where both suffered from numerous defects identified by the Tax Court. (JA1486-1487 & n.18.) Accordingly, the Tax Court correctly concluded that even if there were substantial authority for the independent-investor test, taxpayer had not shown substantial authority for its claimed 2016 deduction because it "did not sufficiently establish (particularly through its expert witnesses) that an independent investor would have found as reasonable the $5 million paid to Mr. Hood in 2016." (JA1515 n.32.)

### 2. Taxpayer has not established reasonable cause and good faith for its substantial understatement of tax in 2016

I.R.C. § 6664(c)(1) provides that "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Whether a taxpayer has met its burden to establish this defense is determined after consideration of "all the pertinent facts and circumstances," but "[g]enerally the most important factor is the extent of the taxpayer's effort to assess [its] proper tax liability." Treas. Reg. § 1.6664-4(b)(1); *Kechijian*, 962 F.3d at 810. The taxpayer bears the burden of establishing its reasonable cause and good faith. *Baxter v. Commissioner*, 910 F.3d 150, 165 (4th Cir. 2018)

Reliance on the advice of a professional tax advisor may demonstrate reasonable cause and good faith, but "the validity of this reliance turns on 'the quality and objectivity of the professional advice which they obtained.'" *Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 548 (5th Cir. 2009) (quoting *Swayze v. United States*, 785

F.2d 715, 719 (9th Cir. 1986)). *Accord, Zfass v. Commissioner*, 118 F.3d 184, 188 (4th Cir. 1997) (reliance must be reasonable).

Taxpayer contended in the Tax Court that it relied on its professional advisors with respect to the amounts it paid Mr. Hood and deducted for both 2015 and 2016. Professional advice on a tax reporting issue for one year may be sufficient for successive years if the issue is one that recurs in substantially similar form. But taxpayer's issue did not recur in the same form. Taxpayer's theory was that it intended to remedy Mr. Hood's historic undercompensation for the years 2000-2014 with a bonus payment in 2015. Fuller computed the amount of that undercompensation at approximately $2.3 million, including both the undercompensation for personal services and for surety-bond guarantees. (JA1957.) In 2015, taxpayer paid Mr. Hood approximately $5.3 million, consisting of $5,168,559 that it characterized as compensation (JA1535), plus about $133,000 that it paid to others for Mr. Hood's personal expenses, or to his adult children who did not work for the corporation, which sums the parties agreed should be treated as compensation to Mr. Hood. (JA196-202.) The 2015 compensation thus more than remedied the 2000-2014 undercompensation. Taxpayer

therefore had no grounds for simply continuing its recently established practice of paying $5 million bonuses to Mr. Hood and deducting the amounts as past due compensation.

Taxpayer nevertheless contends that it had reasonable cause and acted in good faith because it engaged in the "same analysis" in 2016 as it had in 2015 and received the same advice from it tax advisors. (Br. 8, 32.) But the record taxpayer assembled of its 2016 interactions with its advisors does not compare with the record for 2015. The record of its 2015 interactions includes that on May 12, 2015, Mr. Hood, Phillips, and Tammy McGraw, another of taxpayer's executives, met with three employees of the Elliot Davis accounting firm (Stacy Stokes, Jeff Greenway, and Travis Bogan) "to do some serious tax planning – both for Clary Hood, Inc. . . . as well as Clary's estate issues." (JA184; JA1778.) Immediately after the meeting, the participants communicated about how to structure payments to Mr. Hood to avoid adverse tax consequences. In the afternoon, Bogan sent an email to Phillips with some income projections, including that taxpayer could expect net income before tax of $9.9 million, and from which it could subtract a "projected stockholder bonus" of $5 million. (JA1799-1800.)

Then Stokes sent an email to Phillips stating, "I will glance in our research sources to see what is happening in the IRS world to see how it relates to reasonable comp cases." (JA1801.)

On May 14, after presumably glancing at the research sources, Stokes sent an email to Phillips suggesting they speak about what Stokes found "to help you reach a conclusion of what may be a comfortable range." (JA1803.) Stokes commented that he did not want to wait too long because Greenway had "opened the lid to the box and Clary [Mr. Hood] is favoring the bonus route." (JA1804.) On May 15, Stokes sent Phillips his research materials consisting of two chapters entitled "Ensuring That Shareholder/Employee Compensation is Reasonable," and "Applying the Reasonableness Limits on Deductible Amounts." (JA1806-1831.)

After receiving the research materials, Phillips prepared a spreadsheet and circulated it on May 21, 2015. (JA185-186.) The spreadsheet contained financial information for the corporation, Mr. Hood's annual compensation, and a figure labeled "Clary Hood calculated compensation." The "calculated compensation" included: (a) base salary beginning at $200,000 for the year ending May 31, 2000,

and increased by 5% per year;[2] (b) annual bonus of 20% of profits before taxes; (c) annual fee of $100,000 for bonding guarantees, and (d) annual debt guarantee fee equal to approximately 1% of the debt and capital leases personally guaranteed by Mr. Hood. (JA185; JA1832-1833.) The spreadsheet thus displays, for each year, Mr. Hood's actual compensation, a calculated compensation, and the annual and cumulative deficiency. Stokes wrote to Phillips on May 21 that he "tweaked" some numbers, and that "the spreadsheets are a good step in building a case for the Bonus amount." (JA1839.) On May 22, 2015, Greenway wrote to Phillips that he had reviewed the spreadsheets and "it all appears reasonable to me. Of course, as we have discussed previously, there is always a risk that the bonus may [be] challenged by the IRS." (JA186-187, JA1843.)

The Tax Court noted the "contrast" between "the detailed record" surrounding the 2015 advice with taxpayer's production of "almost no evidence" regarding any 2016 advice. (JA1511-1512.) Taxpayer now

---

[2] We note that the Tax Court has rejected an estimate of undercompensation that, like Phillips' estimate, was largely based on one year's base salary adjusted at a constant rate of 5% per year to account for inflation. *Modernage Devs., Inc. v. Commissioner*, 66 T.C.M. (CCH) 1575 (T.C. 1993), *aff'd*, 52 F.3d 310 (2d Cir. 1995).

simply wishes away that contrast, asserting that the Tax Court

sustained the 2016 penalty "even though the uncontroverted testimony

of the same witnesses the Court found fully credible for waiving the

penalty for 2015 unanimously testified that the very same analysis,

protocol, bonus decision-making and advice communicated by Elliot

Davis to CHI for 2015" occurred again with respect to 2016. (Br. 32.)

Review of the witness testimony supports the Tax Court's

characterization of taxpayer's case as consisting of "almost no evidence."

Taxpayer cites the trial testimony of Mr. Hood, Phillips, Stokes, and

Greenway. (Br. 33.) But the testimony of these witnesses on this

subject was feeble and cursory. Taxpayer's CFO, Phillips, did not

explain the process in any detail, but merely testified "we did basically

the same exercise," and "we had [a] meeting similar to" the prior year.

(JA333.) He continued only by responding to taxpayer's counsel's

leading questions:

Q:    And were meetings held among yourself and the accountants

to discuss this?

A:    Yes.

Q:    Was it the same general format as before?

A:     Yes.

(JA333.)

Mr. Hood's only testimony in support of this proposition was also merely an affirmative answer to a leading question:

Q:     Did you go through the same procedure in 2016 as you did in 2015 about the bonus?

A:     Yes.

(JA560.)

Stokes' testimony was similar:

Q:     Okay.  And then did you do a similar type of analysis for Clary Hood, Inc. for the year ended 5/31/16?

A:     Yes.

(JA631.)  Greenway did not testify about the 2016 discussions at all in the portions of the trial transcript cited in taxpayer's brief.  (Br. 32, citing JA723, JA730-731, JA736-738.)

In short, the testimony about whether taxpayer received *any* professional advice about how to report its 2016 compensation payments to Mr. Hood was unconvincing, and the Tax Court was not required to accept it.  It is well established that "[t]he Tax Court, like

any other court, 'may disregard uncontradicted testimony by a taxpayer where it finds that testimony lacking in credibility.' " *Sparkman v. Commissioner*, 509 F.3d 1149, 1156 (9th Cir. 2007) (quoting *Conti v. Commissioner*, 39 F.3d 658, 664 (6th Cir. 1994)).  *See Mills v. Commissioner*, 399 F.2d 744, 749 (4th Cir. 1968) ("the tax court was not bound to find that the presumption accorded the commissioner's determination was overcome by the vague and indefinite testimony of the taxpayer").  Taxpayer does not contend that it received advice from its accountants addressing the extent to which the 2015 compensation remedied the 2000-2014 undercompensation.  And there was no evidence that Mr. and Mrs. Hood relied upon any advice when they approved Mr. Hood's 2016 bonus.  The board of directors minutes approving the 2016 bonus do not reference the amount of any prior undercompensation, the portion remedied with the 2015 bonus payment, and whether some amount of undercompensation remained.  (JA1857.)  The Tax Court thus found "there is no evidence in the record of any communication between [taxpayer] and its advisers that would credibly support a finding that advice was actually rendered with

respect to the 2016 amount." (JA1512.) The Tax Court's finding is correct and should not be disturbed.

## CONCLUSION

The decision of the Tax Court is correct and should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the Commissioner, the appellee herein, respectfully submit that oral argument would be helpful to the Court's resolution of the appeal.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Robert J. Branman

BRUCE R. ELLISEN                (202) 514-2929
ROBERT J. BRANMAN                (202) 307-6538
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*
  *Robert.J.Branman@usdoj.gov*
  *Appellate.Taxcivil@usdoj.gov*

DECEMBER 9, 2022

-70-

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>22-1573</u>     **Caption:** <u>Clary Hood, Inc. v. Commissioner of Internal Revenue</u>

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    ☑ this brief or other document contains <u>12,825</u> [*state number of*] words

    ☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

    ☑ this brief or other document has been prepared in a proportionally spaced typeface using
    <u>MS Office 365</u> [*identify word processing program*] in
    <u>Century Schoolbook 14</u> [*identify font size and type style*]; **or**

    ☐ this brief or other document has been prepared in a monospaced typeface using
    _____ [*identify word processing program*] in
    _____ [*identify font size and type style*].

(s) <u>Robert J. Branman</u>

Party Name <u>Commissioner of Internal Revenue</u>

Dated: <u>December 9, 2022</u>

## CERTIFICATE OF SERVICE

It is hereby certified that, on this 9th day of December 2022, this brief was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system and that one paper copy was sent to the Clerk by First Class Mail. Counsel will be served by CM/ECF.

_/s/ Robert J. Branman_
ROBERT J. BRANMAN
*Attorney*
